FIREMAN'S FUND INSURANCE COMPANIES & another *vs.*
DOUGLAS BLAIS & others.

Bristol.    February 10, 1982. — July 30, 1982.

Present: HALE, C.J., ROSE, & GREANEY, JJ.

*Uniform Commercial Code,* Title. *Sale,* Transfer of ownership. *Motor Vehicle,* Ownership, Transfer of title. *Insurance,* Condition precedent.

Although an agreement had been made for an employer to transfer ownership of an automobile to an employee who had the use of it and arrangements for financing the transaction had been completed before the employee had an accident while driving the automobile, the employer, having failed to execute an assignment of the automobile's title or to mail or deliver the certificate of title to the employee or to the Registrar of Motor Vehicles, remained the owner at the time of the accident, and as the transaction between the employer and the employee did not amount to a transfer of ownership, the employer's insurance coverage for the automobile was not terminated by the transaction. [258-261]

Where an excess-coverage automobile insurance policy provided that no action would lie against the insurer "unless, as a condition precedent thereto, there shall have been full compliance with all the terms" of the policy, and the policy contained a schedule of underlying insurance requiring primary coverage of $300,000, the insured, who had maintained a primary liability insurance policy with a limit of $100,000, could not recover on the excess-coverage policy. [261-262]

CIVIL ACTION commenced in the Superior Court Department on September 14, 1979.

The case was heard by *Zobel,* J.

*Charles R. Desmarais* for Fireman's Fund Insurance Companies.

*Michael J. Duggan* for Nur-Rest, Inc.

*Max Volterra* for Carl J. Weber & another.

*John P. Ryan* for Douglas Blais.

*David D. Dowd* for Insurance Company of North America.

ROSE, J.  This is an action for a declaratory judgment brought under G. L. c. 231A seeking a determination of the rights of various parties in connection with the coverage of certain policies providing automobile liability insurance. The request for a declaratory judgment arises from a related suit between the same parties; in that case, Carl Weber, a minor, by his father and next friend, Carl J. Weber, instituted a tort action in the Superior Court against Douglas Blais and Blais's employer, Nur-Rest, Inc., alleging injuries and consequential damages sustained by Weber on April 3, 1976, when struck by a car operated by Blais.  At the time of the accident, Nur-Rest held an automobile liability insurance policy issued by Fireman's Fund Insurance Companies (Fireman's Fund) and an excess coverage liability insurance policy issued by the Insurance Company of North America (INA).  Subsequent to the commencement of the personal injury action, Fireman's Fund and Nur-Rest initiated this separate action to obtain a declaration by the court regarding the ownership of the automobile when the accident occurred and, if the court should determine that Nur-Rest owned the vehicle at that time, whether the coverage provided by the Fireman's Fund insurance policy applied.  The parties also sought a determination as to whether the excess-coverage insurance policy issued to Nur-Rest by INA was rendered void by virtue of the failure by Nur-Rest to maintain a primary liability insurance policy with coverage limits in an amount of $300,000 per person and $300,000 per occurrence as set forth in the INA policy.  After a hearing, the trial judge found that Nur-Rest owned the automobile at the time of the accident; that the Fireman's Fund insurance policy covered the operation of the vehicle and was in full force and effect; and that INA was not liable to pay any part of any judgment suffered by Nur-Rest or Douglas Blais as a result of the accident.  We affirm the judgment.

1. *The facts.*  While the parties differ as to what legal conclusions may properly be drawn from the facts, they are in essential agreement as to those facts.  In any event, the trial judge's factual findings are not clearly erroneous.  See

Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974); *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 674 (1977). We summarize the relevant facts.

In January, 1975, Nur-Rest purchased a 1973 Chevrolet Caprice station wagon. At that time, Nur-Rest obtained two policies of insurance for the car. One policy, issued by Fireman's Fund, provided liability coverage to a limit of $100,000. That policy contained the statutorily mandated provision terminating coverage "upon sale or transfer" of the vehicle. See G. L. c. 175, § 113A(a)(2)A. A second policy, issued by INA, afforded Nur-Rest excess coverage up to a limit of $1,000,000. Although Milton Thibeault, a principal stockholder of Nur-Rest, believed that the INA policy insured Nur-Rest's liability in excess of $100,000, that policy, as written, only covered liability in excess of $300,000. In fact, the INA policy included a schedule of underlying insurance whereby Nur-Rest agreed to maintain a separate insurance policy with coverage limits of $300,000 per person and $300,000 per occurrence. The INA policy also included a provision that "[n]o action shall lie against INA unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy."

At the time Nur-Rest purchased the automobile, Douglas Blais was employed by it to perform landscaping, house-keeping, laundry and maintenance work at the various nursing homes which the Nur-Rest principals controlled. Nur-Rest furnished Blais with the use of the automobile for the performance of his various work duties, and further authorized Blais to use the automobile for his individual purposes, including transportation to and from his home. Blais was on call to perform work for Nur-Rest at all times, including holidays.

In February, 1976, Nur-Rest decided to sell the automobile. Thibeault, acting for Nur-Rest, offered to sell the vehicle to Blais for a price equal to the balance owed by Nur-Rest under a security agreement executed previously with the Attleboro Trust Company (bank), for which the automobile was collateral. Blais temporized, but in late

March, 1976, after renewed inquiry by Thibeault, agreed to the proposal. To obtain the necessary funds, Blais commenced negotiating with the bank, seeking a loan in the amount of the purchase price (i.e., the balance of Nur-Rest's debt to the bank). On April 1, 1976, Blais filled out the necessary papers with the bank so that he could obtain such a loan. Blais executed a note and security agreement with the bank in the principal amount of $1,321.08 (and additional charges of $244.62). The bank, in turn, credited Nur-Rest's loan account with $1,321.08, stamped the Nur-Rest loan note "Paid" (as of April 2, 1976) and gave the note to Blais. Blais was not required to commence payment on his security agreement with the bank until May 5, 1976, from which fact the trial judge inferred that both the bank and Blais expected delay in the transfer of title to the automobile. After receiving Nur-Rest's cancelled note from the bank, Blais returned to the Nur-Rest office and placed it in Thibeault's drawer. Neither Thibeault nor anyone else acting for Nur-Rest executed an assignment of the automobile's title or mailed or delivered the certificate of title to Blais or to the Registrar of Motor Vehicles.

Blais retained possession of the vehicle, but made no arrangements to procure insurance or to register the automobile in his name. The trial judge concluded that Blais's failure to obtain insurance and change the automobile's registration resulted from his lack of funds and did not relate to the intent of either Blais or Nur-Rest concerning the transfer of ownership of the vehicle. Blais did not remove the license plates from the automobile, and, as the trial judge found, he continued to operate the car with Nur-Rest's express or implied consent.

On April 3, 1976, Blais drove the automobile to his brother's house on a personal errand. From there, he was to proceed on an assignment for Nur-Rest. While en route to his brother's house, Blais was involved in the accident which resulted in the injury to Carl Weber. At the time of the accident, the automobile was still registered in the name of Nur-Rest and the certificate of title had not yet been assigned

to Blais. Blais testified that immediately after the accident he telephoned Thibeault who said, in words or substance, that Nur-Rest had plenty of insurance, and that it was a good thing that Nur-Rest (as opposed to Blais) owned the car. The trial judge refused to conclude from such evidence that Blais and Thibeault believed that Nur-Rest owned the automobile at the time of the accident; rather, he inferred that Blais and Thibeault, realizing that Nur-Rest had not executed the assignment nor delivered the title certificate and that Blais had not obtained his own insurance coverage, simply acted in a manner which indicated their hope that Nur-Rest's insurance coverage applied.

Following the accident, Blais continued to drive the automobile on Nur-Rest business as well as for his own purposes. The license plates which had been issued to Nur-Rest remained on the automobile until May 19, 1976, at which time Blais registered the vehicle in his own name and placed new license plates on it.

2. *Ownership of the automobile.* Relying primarily on G. L. c. 106, § 2-401(3)(a),[1] and G. L. c. 90D, § 15,[2] the trial judge concluded that Nur-Rest was required to deliver the certificate of title for the automobile to either Blais or the Registry of Motor Vehicles in order for the transfer of ownership from Nur-Rest to Blais to be effective. The judge found that Nur-Rest did not so deliver the certificate of title prior to April 3, 1976, the date of the accident, and therefore concluded that Nur-Rest remained the owner of the automobile at that time. The judge further concluded that, since the transaction between Nur-Rest and Blais did not amount to a sale or transfer of ownership as of April 3, 1976, the transaction did not terminate the insurance coverage provided to Nur-Rest by Fireman's Fund. These conclusions of law made by the trial judge were correct.

---

[1] References to sections of G. L. c. 106 are to those sections as inserted by St. 1957, c. 765, § 1.

[2] References to G. L. c. 90D, § 15, are to that section as inserted by St. 1971, c. 754, § 1.

According to the Uniform Commercial Code, a "sale" consists in the passing of title from the seller to the buyer for a price. G. L. c. 106, § 2-106(1). While the Code "instructs us . . . that the rights and obligations of parties under the Code should be sorted out without traditional dependence on the concept of title," *Mechanics Natl. Bank v. Gaucher,* 7 Mass. App. Ct. 143, 146 (1979), strict reliance on the passing of title is nevertheless required when an applicable Code provision "refers to such title." G. L. c. 106, § 2-401. One such situation is provided for in G. L. c. 106, § 2-401(3)(*a*), which states that, unless otherwise explicitly agreed by the parties, in transactions where delivery is to be made without moving the goods, "if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents." The case before us falls squarely within the scope of this provision. First, the record reveals no evidence of an explicit agreement between the parties which would alter the Code's application. Second, Blais's possession of the automobile prior to the proposed sale compels a finding that delivery was to be made "without moving the goods." Finally, Nur-Rest, as seller of the automobile, was required by statute to deliver a certificate of title. See G. L. c. 90D, § 15. In light of the Code provision, we therefore conclude that, since Nur-Rest did not deliver a certificate of title either to Blais or to the Registrar of Motor Vehicles, see G. L. c. 90D, § 15(*a*), until well after April 3, 1976, Nur-Rest was the legal owner of the automobile at the time of the accident.

This conclusion is buttressed by further reference to G. L. c. 90D, § 15. That statute required Nur-Rest, as transferor of a vehicle for which a certificate of title had been issued, to "execute an assignment . . . and warranty of title to the transferee . . . and cause the certificate and assignment to be mailed or delivered to the transferee or to the registrar." G. L. c. 90D, § 15(*a*). The statute further provides in § 15(*e*):

"Except . . . as between the parties, a transfer by an owner is not effective until the provisions of this section

. . . have been complied with; however, an owner who has delivered possession of the vehicle to the transferee and who has complied with the provisions of this section requiring action by him shall not be held liable in any manner whatsoever after delivery of possession of the vehicle for any damages resulting from operation of the vehicle, nor for any automobile law violation which may occur in such operation, even though no new certificate of title has been issued to the transferree."

In light of this statute, and independent of our reliance on the relevant Code provisions, Nur-Rest's failure to comply with the requirements of § 15 as of April 3, 1976, compels the conclusion that Nur-Rest remained the owner of the vehicle at the time of the accident. Compare and contrast *Commonwealth* v. *Sepulveda*, 373 Mass. 862, 863 (1977), where the court observed that "whatever effect noncompliance with G. L. c. 90D, § 15, may have on the legal relations of those concerned with the motor vehicle, it is clear that the failure of prior owners to comply with G. L. c. 90D, § 15, was not intended to be available to a subsequent owner as a defense to the criminal charges of failing properly to register and insure the vehicle" (dictum).

The plaintiffs contend that the phrase "except . . . as between the parties" means, in the present context, that because the intent of the parties determines when title passes, and because Thibeault and Blais intended title to pass to Blais upon pay-out of the Nur-Rest loan, therefore not only did Blais hold title to the automobile at the time of the accident, but the insurance which Nur-Rest had purchased no longer covered the vehicle's operation. See *Country Mut. Ins. Co.* v. *Aetna Life & Cas. Ins. Co.*, 69 Ill. App. 3d 764, 767 (1979) (construing an identical statute). This argument is unavailing, for absent an explicit agreement, see G. L. c. 106, § 2-401(3)(a), title did not pass until Nur-Rest delivered (or mailed) the title certificate to Blais or the Regis-

trar. Although the paperwork at the bank was an essential ingredient in the contemplated transaction, the parties never agreed that it would eliminate the need for execution of the assignment and delivery of the title certificate.

The second statutory exemption, covering "an owner who has delivered possession of the vehicle," G. L. c. 90D, § 15(e), is likewise inapplicable, for it concerns only an owner "who has complied with the provisions of . . . [the statute] requiring action by him." Because Nur-Rest did not execute the assignment or deliver the certificate of title, it had not taken the statutorily required actions; accordingly, Nur-Rest remained the owner of the automobile as of the time of the accident. Thus, the Fireman's Fund insurance policy was in effect at that time and provided coverage to Nur-Rest according to the terms set forth therein.[3]

3. *The INA Policy.* In addition to finding that Nur-Rest was the owner of the automobile at the time of the accident, the trial judge also ruled that the excess-coverage insurance policy issued to Nur-Rest by INA was rendered void by virtue of Nur-Rest's failure to maintain a primary liability insurance policy with coverage limits in an amount of $300,000 per person and $300,000 per occurrence as set forth in the INA policy. The correctness of this ruling depends on whether the provision of the INA policy stating that the insured (Nur-Rest) agreed that such primary insurance coverage was "in force as collectible insurance at inception of this policy" is characterized as a condition precedent, in which case INA's obligation was terminated by Nur-Rest's failure to comply with the terms, or a warranty or representation, in which case coverage could be avoided only if the misrepresentation was made with actual intent to deceive or increased the insurer's risk of loss. See G. L. c. 175, § 186.

Whether contractual language operates as a condition precedent or merely as a warranty or representation is a

---

[3] This is true regardless of whether Blais was operating the automobile for personal or business purposes when the accident occurred, for in either event the trial judge determined that Blais's use of the automobile was authorized by Nur-Rest.

question of law for the court to decide. *Shaw* v. *Commercial Ins. Co.*, 359 Mass. 601, 605 (1971). *Edmonds* v. *United States*, 642 F.2d 877, 883 (1st Cir. 1981). The standard for determining whether contractual terms operate as a condition precedent is set out in *Charles, Henry & Crowley Co.* v. *Home Ins. Co.*, 349 Mass. 723, 726 (1965):

> "[A] statement made in an application for a policy of insurance may become a condition of the policy rather than remain a warranty or representation if: (1) the statement made by the insured relates essentially to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under the policy, either by using the precise words 'condition precedent' or their equivalent."

We believe that both branches of this standard have been met in the instant case. The policy explicitly provides that "[n]o action shall lie against INA unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy" and the schedule of underlying insurance (Schedule A of the INA policy) must surely be considered a "term" of the policy. Furthermore, we cannot say that the inclusion by INA of a provision expressly requiring Nur-Rest to maintain a primary insurance policy with specified coverage limits could not have had any bearing on its decision to issue the policy; for example, perhaps INA wanted to be certain that another insurer of Nur-Rest would have enough at stake to warrant diligent representation in any legal action. For these reasons, we conclude that the provision in the INA policy requiring that Nur-Rest maintain $300,000 per person and $300,000 per occurrence as underlying insurance constituted a condition precedent, and that Nur-Rest's failure to comply with those terms rendered void the INA excess-coverage insurance policy.

*Judgment affirmed.*