**LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant.**

Superior Court of Delaware, New Castle County.

Submitted: Oct. 19, 1983.

Decided: Nov. 28, 1983.

Alan T. Boyd, of Bayard, Brill & Handelman, P.A., Wilmington, for plaintiff.

Jack B. Jacobs (argued) and Donald E. Evans, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant.

WALSH, Judge.

This declaratory judgment action involves a dispute between two liability insurance carriers, Liberty Mutual Insurance Company (Liberty Mutual) and Fireman's Fund Insurance Company (Fireman's Fund) concerning their respective obligations to respond to a personal injury claim of Eugene Wank. On August 8, 1978, Wank was seriously injured in a collision with a truck owned by EDMAC, insured by Fireman's Fund, and operated by EDMAC's employee, Earl Pruitt. At the time of the collision, the truck, with driver, had been trip leased by EDMAC to Central Motor Lines, Liberty Mutual's insured. Subsequent to the filing of this action, Wank recovered a judgment in the amount of $1,447,000 jointly and severally against Pruitt, EDMAC and Central. That judgment is now on appeal.

Since the facts underlying the accident and trip lease are not in dispute and since the controversy between the insurers turns on the interpretation of contracts of insurance, cross motions for summary judgment have been filed. Although North Carolina law governs this dispute under the principle of *lex loci contracti*, the parties agree that no specific North Carolina decision has been discovered which addresses the issues here presented and that general principles of insurance law should apply.

There are three policies of insurance which impact upon the Wank claim, two issued by Liberty Mutual and one by Fireman's Fund. Liberty Mutual had issued a comprehensive automobile liability policy to Central with limits of $500,000 and an umbrella excess liability policy with a limit of five million dollars. Fireman's Fund had issued a comprehensive automobile liability policy to EDMAC with a limitation of one million dollars. Initially, Liberty Mutual had contended that the primary obligation to respond to any judgment secured by Wank[1] was upon Fireman's Fund under its EDMAC policy. It now concedes that its $500,000 policy is primary, *i.e.*, it recognizes its legal responsibility to pay the full proceeds of its basic liability policy toward any judgment secured by Wank, before contribution is sought through any other policy in effect. The remaining issue, therefore, is, as between Liberty Mutual's umbrella excess policy and Fireman's Fund's basic liability policy, which should be assessed for the balance of the Wank judgment?

The resolution of the issue of priority of liability coverage may involve more than a determination of which of the remaining two policies is next in line. If either policy is deemed the "first excess" policy then it alone will suffice to pay the Wank judgment, if ultimately sustained. On the other hand, if neither policy is accorded priority the question arises: On what basis should they share responsibility for the excess

---

1. At trial of the Wank case, Central and EDMAC offered a common defense to both liability and damages and did not seek an allocation of fault. They have, however, reserved the right to secure such allocation in a subsequent proceeding.

award? Liberty Mutual argues for an equal sharing while Fireman's Fund contends that the sharing should be in proportion to the coverage of the policies. And since that coverage difference is five million versus one million the corresponding ratio of responsibility would be five to one in Fireman's Fund's favor.

Liberty Mutual argues that its umbrella policy, even if construed to include both Pruitt and EDMAC as "persons insured," is the only true excess policy in the insurance pool and it should not be required to participate until Fireman's Fund's basic policy is contributed. It thus contends that this is not an "excess versus excess" dispute which involves principles of sharing but an "other insurance" situation specifically contemplated by the "retained limits" provisions of its policy with Central.[2] Pointing to subpart (2) of the definition of "Retained limit," Liberty Mutual asserts that it finds direct application now that its basic policy has been deemed primary and exhausted. As a result it may now require that "other insurance," including Fireman's Fund's comprehensive policy, be contributed before the retained limit be achieved.

Fireman's Fund looks to its own policy to define the limits of its participation. First, it concedes that Pruitt, though not Central, is a named insured since he was a borrowed employee at the time of the accident. But, it argues, its policy is an excess policy because of the so-called "TRUCKMEN'S endorsement" which appears in the following language in Fireman's Fund's policy:

(3) Excess Insurance. With respect to (1) any automobile of the commercial type while leased or loaned to any person or organization, other than the named insured, engaged in the business of transporting property by automobile for others ... the insurance under this endorsement shall be excess over any other valid and collectible insurance, whether primary, excess or contingent, available to the insured. Otherwise, the insurance under this endorsement is primary insurance.

Although Liberty Mutual argues that Fireman's Fund's policy should be viewed as primary insurance to be assessed after its own primary policy has been exhausted, its argument does not square with its concession that its basic policy is primary because EDMAC and Pruitt were "Persons

---

**2.** Liberty Mutual's policy provides in pertinent part:

### EXCESS PROVISION
I. *Coverage—Excess Liability*
The company will pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, as damages, direct or consequential, because of:
(a) personal injury.

*   *   *   *   *   *

DEFINITION OF RETAINED LIMIT
'Retained limit' means as to each occurrence with respect to which insurance is afforded under this policy:
(1) if an underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant 'each person', 'each accident', 'each occurrence' or similar limit of liability stated therein (less any reduction thereof by reason of an over-riding aggregate limit of liability) plus all amounts payable under other insurance, if any;
(2) if an underlying policy otherwise applicable is inapplicable by reason of exhaustion

of an aggregate limit of liability; all amounts payable under other insurance, if any; or
(3) if neither paragraphs (1) or (2) above apply and
(a) the insured has other insurance; all amounts payable under such other insurance, but in no event less than the amount stated in the declarations as the insured's retention, or
(b) the insured has no other insurance; the amount stated in the declarations as the insured's retention.
For the purpose of determining the retained limit, 'other insurance' means any other valid and collectible insurance (except under an underlying policy) which is available to the insured, or would be available to the insured in the absence of this policy, if being the intention that this policy shall not apply under or contribute with such other insurance unless the company's agreement thereto is endorsed hereon.

'underlying policy' mean, respectively, a policy
'underlying insurer' listed as an underlying policy in the declarations and the insurer or insurers subscribings such as a policy

Insured" under the terms of its basic policy. This dispute then becomes an "excess versus excess" dispute since one primary policy has been rendered excess because of the clear language and intent of the other primary policy. *Prudential Property, Etc. v. N.H. Ins. Co.*, N.J.Super., 164 N.J.Super. 184, 395 A.2d 923 (1978).

Nor am I persuaded that Liberty Mutual's excess policy should be afforded secondary recourse because it is of an "umbrella" type which normally would contribute only after all applicable excess policies were exhausted. *See, e.g., Allstate Ins. Co. v. Employers Liability Assur. Corp.*, 5th Cir., 445 F.2d 1278 (1971). As Fireman's Fund urges, the present dispute arises out of a trip lease arrangement between common carriers certificated under the Interstate Commerce Commission, which, while requiring primary insurance coverage of the lessor-owner of the vehicle, looks to the lessee, as the entity in control of the trip or transaction, to provide the balance of coverage. 8A *Appleman, Insurance Law and Practice*, § 4911. Here, of course, the lessor-owner, EDMAC, received the benefit of being an "insured" under the provisions of Liberty Mutual's primary policy issued to Central. Nonetheless, because of its superior knowledge of the risks which the trip would entail, Central through its carrier is responsible for providing excess coverage, whether such coverage be in "umbrella" form or otherwise. Additionally, the language of Fireman's Fund's policy makes it clear that its coverage is deemed excess over all insurance "excess or contingent" available to the insured.

It does not follow, however, that either excess policy is necessarily entitled to immunity simply because each carrier has attempted to remove itself from the obligation to pay any excess coverage until all other insurance has been contributed. Although the exclusion language differs slightly the intent of the respective policies

is the same. Liberty Mutual seeks to render its coverage excess to "any other valid and collectible insurance * * * which is available to the insured, or would be available to the insured in the absence of this policy" while Fireman's Fund attempts to view its coverage as excess "over any other valid and collectible insurance, primary, excess or contingent, available to the insured." I attach no particular significance to the terms "primary, excess or contingent" in Fireman's Fund's policy since the policy is a basic liability policy which would be deemed primary except for the "Other Insured" provisions of Liberty Mutual's primary policy. In essence, there are two excess policies with contradictory provisions which are deemed repugnant.

The conflicting language, stripped to its essentials, reflects an attempt by excess insurance carriers in a trip leasing arrangement to pass to the other the sole responsibility for excess coverage. In a comparable setting, the Court in *American Home Assur. Co. v. American Emp. Ins. Co.*, E.D.Pa., 384 F.Supp. 3, 5 (1974), in rejecting a semantical distinction between similar conflicting policy provisions commented:

Both clauses here are attempting to accomplish the same result; that is, to make each company's policy in excess over any other 'valid and collectible' insurance. When two very closely worded 'other insurance' clauses have come into conflict, the judicial response has been to disregard them as mutually repugnant. (Citing cases)

A further consideration which suggests a sharing of excess coverage is that to permit Fireman's Fund, through EDMAC to avoid participation as an excess carrier would result in its securing free coverage for this accident despite its obligation as the lessor and the general employer of Pruitt, and despite the absence of a reciprocal coverage provision for both primary and excess coverage. See, *Allstate Ins. Co. v. General Fire & Cas. Co.*, D.C.Pa.,

348 F.Supp. 682 (1972); 8A *Appleman on Insurance* § 4911.

Having determined that both Liberty Mutual and Fireman's Fund, through their excess policies, should participate in secondary coverage, I turn now to the question of the basis for such apportionment. Fireman's Fund urges adoption of what is apparently the majority rule which provides that in the event two competing policies, normally primary, become secondary because of "other insurance" clauses, the excess loss is shared *pro rata*, based on their respective policy limits. *Weekes v. Atlantic National Ins. Co.*, 9th Cir., 370 F.2d 264 (1966); *American Home Assur. Co., supra.* To the contrary, Liberty Mutual argues for the application of a "growing minority" standard which requires that excess policies share equally within the limits of the lower policy. See, *Carriers Ins. Co. v. AM Policyholders' Ins. Co.*, Me. Supr., 404 A.2d 216 (1979); *Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.*, N.J.Supr., 28 N.J. 554, 147 A.2d 529 (1959); *Ryder Truck Rent., Inc. v. Schapiro & Whitehouse, Inc.*, Md.Ct.App., 259 Md. 354, 269 A.2d 826 (1970).

The resolution of this problem is not to be found in the language of the policies. Each is silent on the matter of *pro rata* contribution between co-excess insurers. Nor is much assistance to be secured from attempting, as some courts have done, to apportion liability based on premium payments. It is generally recognized that umbrella or excess insurance is cheaper because it is secondary to basic policies which respond to most risks. Here, the Fireman's Fund's policy is not a true excess policy but a comprehensive policy designed to insure EDMAC against all risks up to one million dollars. It is almost fortuitous that it is deemed an excess policy in this unusual situation and, in all likelihood, the premium charged EDMAC by Fireman's Fund for this policy is not proportional to the benefit received. Indeed, the premium paid to Fireman's Fund is not commensu-rate with the risk it here assumed. It is here asked to respond only in terms of excess coverage to a claim covered by a basic liability policy which was purchased at basic rates. If, then, the premium received is out of proportion to the insurance coverage conferred, the basic rationale for the majority rule finds little application. This criticism of the majority rule was aptly stated in *Carriers Ins. Co., supra*, at p. 221:

\*    \*    \*    \*    \*    \*

Unless the multiple policies cover the identical risks, there would be too many variables affecting the premiums to permit them to serve as a benchmark for an equitable adjustment. *Nationwide Mutual Insurance Company v. State Farm Mutual Automobile Insurance Company*, 209 F.Supp. 83 (N.D.W.Va.1962).

The minority approach has been said to be "more equitable and reasonable" because the conditions which brought those clauses into effect still exist. *Ryder Truck Rent., supra* 269 A.2d at 832, n. 3. Both represent excess coverage specifically designed to respond to claims beyond primary coverage. *Cosmopolitan Mut. Ins. Co., supra.*

Moreover, there is a public or social policy consideration supporting the minority view. The majority rule which extracts a sharing based on respective coverages, in effect, penalizes the carrier with greater coverage. This has the undesirable effect of discouraging the purchase of larger limits of liability coverage to the detriment of the injured party for whose benefit public liability insurance is required. This approach is thus contrary to a societal interest. It has been noted that the majority rule discriminates against larger policies without regard to the fact that both insurers, by their contracts, have agreed to cover a loss up to the limits of their policies. Until those limits are reached, the majority rule promotes a subsidy from the high-coverage policy to the low-coverage policy. *Carriers, Ins. Co., supra.*

Finally, an equal sharing of excess coverage is a fair reflection of the respective responsibilities of the insureds. EDMAC, as the owner of the truck and Pruitt's employer, played a larger role between joint tortfeasors, at least in terms of *respondeat superior*. To adopt the majority rule advocated by its insurer, would result in an allocation to it of less than $170,000 out of its $1,000,000 coverage to be applied against a judgment of $1,477,000. If the purpose of co-insurance is to share the risk, such a result seems patently unfair.

In summary, I conclude that the excess policies of both Liberty Mutual and Fireman's Fund should share equally in any judgment ultimately secured by Wank in excess of $500,000, the primary coverage for which Liberty Mutual is solely liable.

IT IS SO ORDERED.