MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
 

 GERTNER, District Judge.
 

 I.
 
 INTRODUCTION
 

 On May 23,1994, a serious fire occurred at the Cardinal Cushing Campus of Good Samaritan Medical Center (“Good Samaritan”) in Brockton, Massachusetts. Prior to the fire, Good Samaritan was covered by a policy issued by plaintiff Insurance Company of North America (“INA”). One month before the fire, however, Good Samaritan decided to replace INA’s policy with one written by defendant Protection Mutual Insurance Company (“Protection Mutual”). Protection Mutual’s policy went into effect as of April 20, 1994, but Good Samaritan’s instructions to INA regarding the cancellation date of its existing policy — requesting cancellation “as soon as possible but no later than May 31”— were less than precise.
 

 After learning of the existence of the Protection Mutual policy, INA disclaimed coverage. INA contended that Good Samaritan’s purchase of coverage from Protection Mutual had the effect of cancelling the INA policy as of April 20, 1994, the date on which Protection Mutual’s coverage commenced. Protection Mutual insisted that INA was liable for a share of the loss. Unable to resolve their dispute, the two insurers agreed that each would pay half of Good Samaritan’s claim, while reserving their rights against each other. INA then commenced this action seeking a declaration of the parties’ respective liabilities.
 

 Before me now are the parties’ cross-motions for summary judgment. INA contends that it is not liable for any of the fire loss because its policy was not in effect at the time of the fire. Alternatively, INA contends that Protection Mutual’s policy should be considered primary and therefore must be exhausted before any claim can be made against INA.
 

 
 *82
 
 Protection Mutual insists that both policies were in effect at the time of the fire and further that INA’s policy was primary, thus requiring exhaustion of INA’s coverage first. Alternatively, Protection Mutual seeks an order allocating liability between the parties on a pro rata or equal basis.
 

 II.
 
 FACTS
 

 The facts are largely undisputed. Good Samaritan Medical Center was created on October 1,1993 as the result of the merger of two hospitals: Cardinal Cushing General Hospital in Brockton (“Cardinal Cushing”) and Goddard Memorial Hospital in Stoughton (“Goddard”). Prior to the merger, Goddard was covered by a property insurance policy issued by Protection Mutual. Cardinal Cushing, however, was insured through an institutional insurance program administered by the Roman Catholic Archdiocese of Boston.
 

 The Arehdiocesan Institutional Insurance Program (“the Institutional Program”) provided property insurance to numerous institutions affiliated with the Catholic Church in the Boston area, through a combination of self-insurance and an outside carrier. In particular, the Archdiocese was covered by a policy from INA which provided that, in the event of a covered loss, the Archdiocese would be required to pay the first $10,000 of each loss under the Institutional Program while INA would be liable for the excess. In addition, the Archdiocese was required to pay the first $100,000 in annual losses in excess of the $10,000 per loss deductible. Because the INA policy covered only those Archdiocesan affiliates which the Archdiocese “ha[d] agreed to insure,” the property of affiliated institutions was covered under the INA policy only to the extent those institutions were covered under the Institutional Program.
 

 After the two hospitals merged in 1993, the two “campuses” of the newly formed Good Samaritan continued to be covered by separate insurance. In 1994, however, Good Samaritan’s board of directors determined to reevaluate its insurance program with an eye toward consolidating its coverage under a single insurer. It enlisted the services of an insurance consulting firm, Deloitte & Touche, which recommended that Good Samaritan consolidate its coverage with Protection Mutual in order to realize significant premium savings.
 

 Good Samaritan followed this advice and subsequently solicited coverage from Protection Mutual. On April 20, 1994, Protection Mutual amended Good Samaritan’s policy to add coverage for the Cardinal Cushing campus. However, Good Samaritan did not immediately move to cancel its coverage under the Institutional Program. It was not until the first week of May that Joseph Ciccolo, Good Samaritan’s Controller, called Arthur Powers, the official who administered the Institutional Program for the Archdiocese, to discuss the matter.
 

 During this conversation, Ciccolo advised Powers of Good Samaritan’s decision to obtain insurance elsewhere. Although Powers does not recall the conversation in detail, Ciccolo states that Powers asked him whether “Good Samaritan was going to ask for a retroactive adjustment of the premium or a refund.”
 
 [1]
 
 Ciccolo further states that he responded by stating that he “would be remiss as a financial officer if [he] did not [ask for a refund]. However [he] could understand the problems that this [is] going to cause. So make [the cancellation date] no later than May 31.”
 

 Ciccolo and Powers’ conversation was followed by a letter from Michael Sullivan, Good Samaritan’s Vice President of Finance, to Powers, dated May 6, 1994. The letter stated, in relevant part: “I am writing this letter to inform you that we wish to cancel certain insurance policies for all entities as soon as possible, but no later than May 31, 1994.” On May 13,1994, Powers wrote back to Sullivan stating:
 

 I was disappointed but not surprised to receive your letter of May 6,1994 advising this office that you are withdrawing from all lines of the Archdiocesan Risk Management programs. It is unfortunate that you did not see fit to take advantage of the
 
 *83
 
 programs offered through this office for the combined operations.
 

 I shall effect cancellation effective May 31, 1994 of:
 

 — Institutional Fire, including Business Interruption
 

 — Comprehensive Boiler and Machinery, including Business Interruption
 

 — Inland Marine — Various
 

 — Automobile Liability/Physical Damage On the same day, Powers faxed a note to
 

 Hal Mackins, an insurance broker at the firm of Marsh and McLennan who handled the Archdiocese’s account with INA, instructing him to cancel the policies effective May 31. Mackins, in turn, sent a letter dated May 19, 1994 to Steven Guariglia, the INA account executive who handled the Archdiocese account, requesting that he delete coverage for the Cardinal Cushing campus, effective May 31,1994.
 

 Four days later, on May 23, 1994, a fire occurred in the boiler room at the Cardinal Cushing campus, causing extensive damage. On the night of the fire, MacKenzie Smith, a member of Good Samaritan’s board and the agent through whom Good Samaritan purchased the Protection Mutual policy, advised Protection Mutual of the loss. A Good Samaritan employee also notified the Archdiocese. The next day, on May 24, 1994, Powers arrived to inspect the damage and advised Good Samaritan personnel that INA coverage was still in place.
 

 Two weeks after the fire Powers dramatically changed his position with respect to coverage. By letter dated June 8, 1994, he advised Michael Sullivan that:
 

 Notwithstanding my letter of May 13, 1994, which allowed your office (perceived) extra time to replace those coverages that you requested in your May 6, 1994 letter, please see return premium invoices effective April 20, 1994 following your advice that coverage was actually replaced as of that date.
 

 It follows then, that your late advice putting this office on notice that the Cushing campus experienced a fire in its boiler room the night of May 23, 1994 be denied as a notice of loss since coverage had been replaced as of April 20, 1994. In addition, your office had previously advised Factory Mutual[
 
 2
 
 ] of the unfortunate fire of May 23rd, 1994 giving clear indication of intent and understanding that Factory Mutual was the insurer for 235 North Pearl Street, Brockton.
 

 Enclosed with Powers’ letter were invoices purporting to cancel (and refund premium for) all of Good Samaritan’s insurance coverages under the Institutional Program, retroactive to April 20, 1994. Good Samaritan rejected these retroactive cancellations, however, and submitted claims to both INA and Protection Mutual for damage caused by the fire.
 

 On October 7, 1994, Powers once again reversed his position and authorized Hal Mackins, the INA broker, to change the cancellation date on Good Samaritan’s coverage back to May 31, 1994. Mackins forwarded this request to Steve Guariglia of INA, but INA refused to comply. Indeed, in January of 1995, INA issued an endorsement to the Archdiocese’s policy purporting to cancel coverage for the Cardinal Cushing campus effective April 20,1994.
 

 III.
 
 DISCUSSION
 

 A.
 
 Whether Good Samaritan was Covered under the Archdiocesan Institutional Insurance Program as of the Date of the Fire
 

 INA advances three arguments for its position that Good Samaritan was not covered under the Institutional Program as of the date of the fire. First, INA contends that Good Samaritan’s act of purchasing substitute insurance from Protection Mutual can-celled its coverage under the Institutional Program as a matter of law. Second, INA asserts that Good Samaritan’s request to Arthur Powers to cancel its coverage “as soon as possible” had the immediate effect of cancelling Good Samaritan’s participation in the Institutional Program. Finally, INA claims
 
 *84
 
 that the Archdiocese was contractually and legally bound to self-insure its annual deductible of $100,000 and that Good Samaritan’s purchase of insurance from Protection Mutual was a breach of this requirement, terminating coverage as a matter of law. For the reasons stated below, I reject all of these claims and conclude that Good Samaritan was still covered by the Institutional Program (and thus by INA) at the time of the fire.
 

 1.
 
 Cancellation by Substitution
 

 INA’s principal contention is that Good Samaritan’s purchase of new insurance from Protection Mutual, combined with its intent to cancel its coverage under the Institutional Program, effected such a cancellation, notwithstanding the subsequent statements of Mr. Powers to the contrary. In support of its position, INA relies on the doctrine of “Cancellation by Substitution,” a rule of uncertain provenance which has been largely diluted or rejected outright by modem courts.
 

 The doctrine holds that when an insured purchases new insurance covering the same risk as existing insurance, with the intention of substituting the new policy for the existing one, a court of equity may consider the existing policy to be cancelled as a matter of law, even in the absence of a mutual agreement to do so.
 
 See Arnfeld v. Guardian Assur. Co. of London,
 
 172 Pa. 605, 34 A. 580 (1896);
 
 Bache v. Great Lakes Ins. Co.,
 
 151 Wash. 494, 276 P. 549 (1929). The overwhelming weight of modern authority has rejected the rule. These authorities hold that an insurance contract, like any other, cannot be terminated except by its terms, or by mutual consent.
 
 See MFA Mutual Ins. Co. v. Southwest Baptist College, Inc.,
 
 381 S.W.2d 797, 801-802 (Mo.1964) (requiring a “meeting of the minds of the contracting parties”);
 
 Copley v. Pekin Ins. Co.,
 
 111 Ill.2d 76, 94 Ill.Dec. 757, 761-762, 488 N.E.2d 1004, 1008-1009 (1986) (noting that “doctrine of cancellation by substitution is now disfavored in many jurisdictions”);
 
 Franklin v. Carpenter,
 
 309 Minn. 419, 244 N.W.2d 492, 495 (1976) (same);
 
 Graves v. Republic Ins. Co.,
 
 516 F.Supp. 424, 427 (E.D.Pa.1981) (interpreting New Jersey law as not permitting cancellation by substitution);
 
 Capuano v. Kemper Ins. Companies,
 
 433 A.2d 949, 956 (R.I.1981) (requiring “meeting of the minds”);
 
 Providence Washington Ins. Co. v. Security Mutual Ins. Co.,
 
 35 N.Y.2d 583, 364 N.Y.S.2d 479, 482, 324 N.E.2d 134, 136 (1974) (“Even where the insured does intend to cancel the policy, and is in the process of obtaining substitute coverage, notice is required to fix the date when the old policy will terminate.”);
 
 Ector v. American Liberty Ins. Co.,
 
 138 Ga.App. 519, 226 S.E.2d 788, 790 (1976) (termination of insurance contract requires “at a minimum notice or a request for cancellation communicated to the insurer.”);
 
 Milbank Mut. Ins. Co. v. State Farm Fire & Cos. Co.,
 
 294 N.W.2d 426 (S.D.1980) (requiring mutual consent).
 
 See also
 
 Annot.,
 
 Obtaining New Property Insurance
 
 As
 
 Cancellation of Existing Insurance,
 
 14 A.L.R.4th 781 (1980) (collecting cases).
 

 Although there is no controlling Massachusetts case on this issue, I have no trouble concluding that Massachusetts courts would follow the modem view, which is grounded in the general principle that absent some overriding concern of public policy, contracts should not be terminated except by their own terms or by mutual agreement of the parties.
 
 Cf. Cardin v. Royal Ins. Co. of America,
 
 394 Mass. 450, 453, 476 N.E.2d 200 (1985) (where language of insurance policy is unambiguous, it should be interpreted the same as any other contract). There does not appear to be any such public policy concern here. To the contrary, the doctrine of cancellation by substitution tends to increase uncertainty by making enforcement of an insurance policy dependent on the subjective intent of the insured.
 
 Milbank,
 
 294 N.W.2d at 430.
 

 In the instant case, there was never an agreement by the parties to cancel Good Samaritan’s participation in the Institutional Program automatically when it purchased new insurance from Protection Mutual. Neither was there a provision requiring cancellation in either the INA policy covering the Archdiocese, or in the Archdiocese policy covering Good Samaritan. Accordingly I find that Good Samaritan’s purchase of substitute insurance from Protection Mutual did not result in the automatic cancellation of
 
 *85
 
 Good Samaritan’s coverage under the Archdiocesan Institutional Insurance Program.
 

 2.
 
 Good Samaritan’s Notice of Cancellation
 

 INA next argues that the policy purchased by the Archdiocese permitted an insured to cancel coverage “at any time ... by surrender of the policy to the Company” and that Michael Sullivan’s May 6, 1994 letter to Arthur Powers, requesting termination “as soon as possible,” constituted such a cancellation. INA’s argument fails in two respects. First, the only request made by an insured to INA was Powers’ request to remove Good Samaritan from the INA policy effective May 31, 1994. Good Samaritan never made any request to INA directly nor did it surrender the policy to INA
 

 Second, Sullivan’s May 6, 1994 letter to Powers cannot properly be construed as reflecting a demand to terminate the policy immediately. “[A] request for cancellation of an insurance policy must be unequivocal and absolute.”
 
 Adler v. Burnes, 288
 
 Mass. 409, 412, 192 N.E. 922 (1934). Sullivan’s letter was not. It did not demand that coverage be terminated immediately. Rather, in light of the prior conversation between Powers and Ciccolo, Sullivan’s letter made it clear that Good Samaritan was not demanding immediate cancellation. Rather, the letter evidences Good Samaritan’s offer, made as a courtesy to the Archdiocese, to retain coverage on the policy (and thus permit the Archdiocese to retain premium) through May 81, 1994. Powers’ subsequent letters to both Sullivan and to Hal Mackins conclusively demonstrate that the Archdiocese accepted Good Samaritan’s offer, and chose May 31, 1994 as the cancellation date. Having sought the benefit of Good Samaritan’s extra premium through May 31, 1994, the Archdiocese cannot now disown the concomitant obligation to cover Good Samaritan’s losses during that period. INA, which had agreed to insure all of those properties which the Archdiocese had agreed to insure, was therefore similarly bound to insure Good Samaritan through May 31,1994.
 
 [3]
 

 3.
 
 The Archdiocese’s Self-Insurance Obligations
 

 INA’s final argument concerning coverage is that “[t]he Archdiocese was forced to cancel Good Samaritan’s coverage under the INA policy in order to avoid the breach of a warranty mandated by Massachusetts insurance regulations and a condition to coverage under the INA policy.” INA contends that a Massachusetts insurance regulation, 211 Code Mass.Reg. § 6.01 (1995),
 
 [4]
 
 requires
 
 *86
 
 that the Archdiocese’s $100,000 annual deductible remain self-insured, thus somehow imposing on Good Samaritan a duty not to purchase other insurance. INA further contends that the Archdiocese guaranteed that it would remain self-insured as a condition to coverage, and that Good Samaritan’s purchase of additional insurance breached this condition.
 

 INA’s regulatory argument suffers from three flaws. First, the regulation cited by INA appears to have been effective for only one year from April 2, 1956, and thus would not appear to have any applicability to the INA policy at issue here. Moreover, even if the regulation were in force, it appears to do nothing more than waive certain rate filing requirements for insurance policies which include certain terms. It certainly does not mandate that policies contain those terms, or penalize insureds who do not act according to such terms when they are not contained in their policies.
 

 INA’s condition precedent theory is equally misplaced. INA claims that “on more than one occasion,” the Archdiocese “guaranteed” INA that the $100,000 annual deductible would not be insured through other means. However, no such guarantee is contained in the INA policy. In fact, the policy contains numerous clauses dealing with the purchase of additional insurance. When the terms of a contract are clear, a Massachusetts court will not look to extrinsic evidence to find a condition precedent.
 
 [5]
 

 Massachusetts Municipal Wholesale Electric Co. v. Danvers,
 
 411 Mass. 39, 48, 577 N.E.2d 283 (1991). Since the INA policy does not contain a requirement that the Archdiocese self-insure its annual deductible, I will not read one into it.
 

 B.
 
 Apportionment
 

 Having concluded that Good Samaritan was covered by the Institutional Program as of the time of the fire, I must now determine how liability should be apportioned as between INA and Protection Mutual.
 

 Each of the policies at issue here contain what is known as an “other insurance excess” clause. Each such clause provides that the policy shall pay only in excess of any other insurance covering the same risks.
 
 [6]
 
 
 *87
 
 Since the enforcement of both of these clauses taken literally would result in no coverage for the insured, a Massachusetts court of equity will consider the clauses mutually repugnant and will equitably apportion liability as between the two insurers, so as best to effectuate the policy terms.
 
 Mission Ins. Co. v. United States Fire Ins. Co.,
 
 401 Mass. 492, 493-497, 517 N.E.2d 463 (1988).
 

 INA contends that Protection Mutual should bear the entire burden of the loss because Protection Mutual’s policy is “primary” while its own policy is “excess.” INA essentially argues Protection Mutual’s policy was intended to cover the first dollar of loss (minus a $10,000 per incident deductible) while INA’s policy was intended as excess of loss reinsurance, i.e. to cover losses in excess of primary insurance. INA points out that the Archdiocese acted as a kind of primary insurer for Institutional Program participants: it was responsible for paying the first $100,000 of claims annually under the program. Since INA’s coverage was essentially “excess” of the Archdiocese’s, INA concludes that it should be considered an “excess” carrier, not required to pay before all “primary” insurance is exhausted.
 

 The flaw in this argument is that there is no indication in the record that the INA policy was ever intended to be excess of any insurance other than that provided by the Archdiocese itself.
 
 [7]
 
 It is apparent, rather, that the INA policy, which provides in excess of $1 billion in coverage, was specifically designed with the Institutional Program (and its relatively small $100,000 annual self-insurance coverage) in mind. In particular, the INA policy was never intended to be excess of a policy such as Protection Mutual’s, which itself provided coverage for all but the most catastrophic events.
 
 [8]
 
 INA bargained for a policy which had what was essentially a $100,000 annual deductible. Transforming the policy into one in excess of potentially limitless other insurance would inequitably relieve INA of its contractual obligations.
 

 INA also argues that its policy should be considered excess of the Protection Mutual policy because its coverage is more general, applying to a wider range of risks.
 
 See Brockway-Smith Co. v. Boston & Maine Corp.,
 
 497 F.Supp. 814, 823-824 (D.Mass. 1980) (construing “general or blanket” policy to be excess over more specific policy). In
 
 Brockway-Smith,
 
 one policy covered real or personal property losses which occurred on or near the insured’s property, while the other covered all goods in transportation between initial shipment and arrival at their destination. The loss in question fell within the coverage of both policies. The court found that “the authorities generally agree that a general or blanket policy is intended only to supplement specific insurance; it does not become effective until the specific insurance is exhausted.”
 
 Brockway-Smith,
 
 497 F.Supp. at 823. The court concluded that the transportation policy was more specific than the property policy, and concluded that it should be exhausted before payments be required under the property policy.
 
 [9]
 

 Id.
 

 The reasoning of
 
 Brockway-Smith
 
 is inapplicable here. Under the facts of this case, there is no indication that the INA policy was intended to supplement specific insurance. Both the INA and Protection Mutual policies provided comprehensive property damage protection to their insureds. While it is true that INA covered a much broader range of properties than did Protection Mutual, there appears from this no implication that INA’s policy was intended to be excess. Rather, it is clear that INA’s policy was intended as a mechanism to permit individual Archdioeesan institutions to “opt in” to INA’s policy for their specific risks. In this sense,
 
 *88
 
 the INA policy is no more general (with respect to any potential claimant) than Protection Mutual’s policy.
 

 Not surprisingly, Protection Mutual offers in response to INA a counter-theory as to why the Protection Mutual policy should be considered excess of INA’s. According to Protection Mutual, it has received a waiver from the Massachusetts Commissioner of Insurance, permitting it to vary the language of its fire insurance policy from the Massachusetts Standard Fire Insurance Policy (the “Standard Policy”) prescribed by M. G.L. eh. 175 § 99.
 
 [10]
 
 By contrast, INA has received no such waiver, and thus is bound by any clauses in the Standard Policy inconsistent with INA’s policy language.
 
 See Church of Christ in Lexington v. St. Paul Surplus Lines Ins. Co.,
 
 22 Mass.App.Ct. 407, 494 N.E.2d 45 (1986). Protection Mutual contends that one clause in the Standard Policy mandates a “pro rata” allocation of liability as between overlapping policies. Protection Mutual contends that a policy containing a “pro rata” clause (as it contends INA’s does) must pay in its entirety before a policy with an “excess” clause (such as Protection Mutual’s) must pay at all.
 

 This argument fails because the “pro rata” clause contained in the Standard Policy does not in any way mandate a pro rata allocation. Rather, it provides only that “[t]his company shall not be hable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved.” While this clause provides a ceiling on coverage when other policies overlap and thus insures that the policy owner does not receive double recovery for a single loss, it does not prohibit the payment of a lesser amount.
 
 See Mission Ins. Co. v. United States Fire Ins. Co.,
 
 401 Mass. 492, 495, 517 N. E.2d 463 (1988). It is thus not inconsistent with INA’s other policy language mandating excess coverage only.
 

 Alternatively, Protection Mutual argues that both policies should be considered primary insurance and that liability should be allocated among them on a pro rata basis based on policy limits. While I agree that both policies should be considered primary, I disagree that proration provides an equitable solution to the parties’ dispute. Rather, I conclude that liability in equal shares best reflects the obligations undertaken by the parties.
 

 Pro rata liability, based on relative policy limits, was the ancient rule in Massachusetts.
 
 See Austin v. Dixie Fire Ins. Co.,
 
 232 Mass. 214, 122 N.E. 382 (1919) (prorating liability based on policy limits);
 
 Taber v. Continental Ins. Co.,
 
 213 Mass. 487, 100 N.E. 636 (1913) (same). It also appears to be the majority rule today.
 
 See, e.g., Continental Casualty Co. v. Aetna Casualty and Surety Co.,
 
 823 F.2d 708, 712 (2d Cir.1987);
 
 Allstate Ins. Co. v. Chicago Ins. Co.,
 
 676 So.2d 271, 275 (Miss. 1996);
 
 Chedville v. Ins. Co. of North America,
 
 664 So.2d 1310, 1314 (La.App.1995);
 
 Columbia Mutual Ins. Co. v. State Farm Mutual Automobile Ins. Co.,
 
 905 P.2d 474, 475 (Alaska 1995);
 
 Empire Fire and Marine Ins. Co. v. North Pacific Ins. Co.,
 
 127 Idaho 716, 905 P.2d 1025, 1028 (1995);
 
 Bosco v. Auto-Owners Ins. Co.,
 
 212 Mich.App. 421, 539 N.W.2d 517 (1995).
 
 See also
 
 John Alan Appleman and Jean Appleman,
 
 Insurance Law and Practice Vol. 6
 
 § 3905 (1972). Under such a “policy limits” rule, each insurer is liable for a percentage of the total loss equal to the ratio of the insurer’s total policy limit to the sum of the policy limits of all policies covering the risk.
 

 The “policy limits” proration rule has been criticized, however, because it imposes a burden on the larger policy which is incommensurate with the relative size of policy premiums.
 
 See Mission Ins. Co.,
 
 401 Mass, at 500, 517 N.E.2d 463;
 
 Reliance Ins. Co. v. St. Paul Surplus Lines Ins. Co.,
 
 753 F.2d 1288, 1291-1292 (4th Cir.1985);
 
 Carriers Ins. Co. v. American Policyholders’ Ins. Co.,
 
 404 A.2d 216, 221-222 (Me.1979);
 
 Stonewall Ins. Co. v.
 
 
 *89
 

 City of Palos Verdes Estates,
 
 46 Cal.App.4th 1810, 54 Cal.Rptr.2d 176, 205-207 (1996);
 
 Liberty Mut. Ins. Co. v. Fireman’s Fund Ins. Co.,
 
 479 A.2d 289, 293-294 (Del.Sup. 1983). As explained by the Supreme Judicial Court of Maine:
 

 [I]t is commonly known that the cost of liability insurance does not increase proportionately with the policy limits — Once minimiun coverage has been obtained, significant supplemental coverage can be obtained at only a modest increase in cost____ The [policy limits] rule unfairly discriminates against the larger policy by apportioning the loss in proportion to the respective policy limits, utterly forgetting that both insurers, by their contracts, have in fact agreed to cover a loss up to the limits of the lesser policy. Until that point is reached, the [policy limits] rule amounts to no more than an unacceptable subsidy of the high coverage to the low-coverage carrier____
 

 Carriers,
 
 404 A.2d at 221-222.
 

 Application of the policy limits rule would be especially inequitable in the instant case. The INA policy, which covered hundreds of locations affiliated with the Archdiocese, included a total policy limit slightly in excess of $1 billion.
 
 [11]
 
 By contrast, the Protection Mutual policy, which only covered Good Samaritan and its affiliates, included a total limit of approximately $250,000,000.
 
 [12]
 
 Given the drastically different scope of coverage of the two policies, it would seem that their respective coverage limits in no way reflect an intent to take on different risks with respect to Good Samaritan.
 

 In
 
 Mission Ins. Co.,
 
 401 Mass, at 500, 517 N.E.2d 463, two insurance companies sought a declaration as to their respective liabilities under overlapping policies, both of which covered claims arising out of a motor vehicle accident. The Massachusetts Supreme Judicial Court declined to prorate liability based on a “policy limits” rule and instead adopted an “equal shares” rule, whereby each insurer is required to “contribute equally until the policy with the lower limit is exhausted.”
 
 Id.
 

 I find that an “equal shares” rule achieves the equitable result in this case. Both insurers, by accepting premium from Good Samaritan, understood that they were potentially insuring the entire risk, up to their respective policy limits. But for the fortuity of double coverage, both insurers would have been bound to pay the entire amount of the loss minus deductibles.
 
 [13]
 
 Proration thus exacerbates what is already a windfall for the insurer with the lower policy limit.
 
 See Reliance Ins. Co., 753 F.2d
 
 at 1291-1291. An “equal shares” rule does not suffer from this flaw and comes closest to making both insurers liable for the coverage which they promised to provide.
 

 IV.
 
 CONCLUSION
 

 Accordingly, I conclude that liability for the Good Samaritan loss should be allocated as follows: Each party shall contribute equally for the total amount of the loss until the policy with the lower limit is exhausted, after which the party with the higher policy limit shall be liable for the remainder of the loss until its policy limit is exhausted. Each party may subtract from its total liability any applicable deductible under its respective policy.
 

 SO ORDERED.
 

 [1]
 

 . Good Samaritan had paid several months premium in advance.
 

 [2]
 

 . Although it is not entirely clear from the record, an entity known as "Factory Mutual Engineering” appears to have served as an agent or adjuster for Protection Mutual after the fire.
 

 [3]
 

 . There can be no genuine doubt from this record that, had the fire not occurred, the Archdiocese and INA would have kept Good Samaritan's premium through May 31, 1994 without complaint.
 

 Powers now claims, after the fact, that had he known of the existence of the Protection Mutual policy, he would have cancelled Good Samaritan's coverage retroactively to April 30, 1994 in order to avoid double coverage. This statement is simply incredible. It suggests that Powers believed that Good Samaritan had requested the Archdiocese to terminate its property insurance coverage "as soon as possible” while at the same time believing that Good Samaritan had not yet obtained replacement coverage. That is, Powers claims he believed that Good Samaritan had requested that it be put in a position of having no insurance coverage at all. If Powers did hold such a belief, it was certainly not a reasonable one. Moreover, since Good Samaritan had paid premium in advance to the Archdiocese and the Institutional Program did not prohibit other insurance, it does not appear that Powers had the ability to effect such a cancellation absent Good Samaritan’s "unequivocal and absolute" consent.
 
 Adler v. Burnes,
 
 288 Mass. 409, 412, 192 N.E. 922 (1934).
 

 [4]
 

 . Section 6.01 provides in relevant part as follows: "|T|he Commissioner of Insurance hereby suspends the filing requirement of M.G.L. c. 174A with respect to excess of loss coverage subject to 211 CMR 6.00:
 

 (1) There must be a retention by the insured as to each loss occurrence in an amount not less than the maximum loss reasonably to be expected during the currency of the policy after giving consideration to the loss history, construction, occupancy and protection of the properties involved; and
 

 (2) The retention as to each loss occurrence must, in any case, be a minimum of $100,000; and
 

 (3) The insured must warrant that the retention shall not be covered by any policy of insurance; and
 

 (4) The coverage must relate to special situations as to which statistical justification for the rate is not reasonably obtainable; and
 

 
 *86
 
 (5) The rate must be obtained from special analysis of the particular situation and not from application of a regular scale of rates.
 

 The form of agreement evidencing the coverage shall be drawn in each instance to meet the requirements of the situation in the form prescribed by M.G.L. c. 175 §§ 99, 102A, and two copies of each agreement purporting to meet the requirements of this regulation shall be filed with the Department for approval; but it is not necessary for more than one participating company to submit copies of the agreement, together with a brief analysis of the account, if the others have ascertained information that such agreement has been filed with this Department.
 

 It is to be noted that the suspension or modification of filing requirements does not suspend any of the other provisions of the rate regulatoiy laws or of M.G.L. c. 175, §§ 95 through 99, 102A and other applicable sections of M.G.L. c. 175.
 

 All companies shall keep separate records of excess of loss business and the figures relating thereto shall be recorded and reported separately-
 

 This order shall be effective for one year from April 2, 1956.
 

 211 Code Mass.Reg. § 6.01 (1995).
 

 [5]
 

 . A statement of fact made by an insured prior to entering into an insurance contract will generally not be considered to be a condition precedent unless "(1) the statement made by the insured relates to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under the policy, either by using the precise words 'condition precedent' or their equivalent.”
 
 Fireman’s Fund Ins. Cos. v. Blais,
 
 14 Mass.App.Ct. 254, 262, 438 N.E.2d 360 (1982). Rather, such statements will be considered at most to be warranties or representations.
 
 Id.
 

 Since no special language was alleged to have been used by the Archdiocese here, its statements must be considered warranties or representations. As warranties or representations, the Archdiocese’s statements prevent recovery only if they were made with an actual intent to deceive, or increased the risk of loss. M.G.L. ch. 175 § 186. These elements are also absent here.
 

 [6]
 

 . The INA policy provides that "if there is other collectible insurance, this policy will cover as excess insurance and will not contribute with such other insurance.” The Protection Mutual policy provides that "[t]he Company shall not be liable for loss or damage under this Policy if at the time of such loss or damage there is any other insurance which would attach if this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributory insurance, and then only after all other insurance has been exhausted.”
 

 [7]
 

 . Of course, as discussed above, the INA policy contains an "excess” other insurance clause. But so does the Protection Mutual policy. What is lacking is any evidence other than these mutually annihilating pro forma clauses that there was a specific intent that the INA policy be excess.
 

 [8]
 

 . Protection Mutual's policy provided total coverage in excess of $250,000,000.
 

 [9]
 

 . The court reasoned that the transportation policy was primary because the insured was specifically aware that the damaged goods were in transit, while it was not aware that they happened to be on its property.
 
 Brockway-Smith,
 
 497 F.Supp. at 824, n. 21.
 

 [10]
 

 . M.G.L. ch. 175 § 99 requires, with certain exceptions, that all fire insurance policies issued in Massachusetts contain certain mandatory language. M.G.L. ch. 175 § 99B permits the Commissioner of Insurance to approve alternatives to the standard language of Section 99 for policies covering business, professional or governmental policyholders, so long as the approved language is no less favorable to policyholders than the standard language.
 

 [11]
 

 . The INA policy contains various sublimits for certain types of liability, including, for example, a $51,710,801 per occurrence limit on business income claims at the Cardinal Cushing campus. It is not clear from the record what, if any, sublimits apply in this case.
 

 [12]
 

 . The Protection Mutual policy provided $188,-294,000 in property damage coverage, $75,000,-000 in gross earnings coverage, $6,000,000 in "extra expense” coverage, and $500,000 in "accounts receivable" coverage.
 

 [13]
 

 . Neither party has suggested that Good Samaritan's claim exceeds the coverage limit under either policy.