[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER TRIAL
This matter arises from a contest concerning the lawful possession of a Suzuki motorcycle. In the First, Second, Third and Seventh counts of the Complaint dated August 5, 1997, the plaintiff Shawn Barron, alleges that he owned this vehicle, and that it was converted by the acts of the defendants Benton Auto Body, Inc. (Benton), Bozena Fraczek, Leon Green, and Bradford Bell, thereby depriving him of his lawful interest in the property. In the Fourth, Fifth and Sixth Counts of the complaint, the plaintiff further complains that the defendants Benton, Fraczek and Green caused him to suffer harm as the result of their careless and negligent failure to identify and locate him, as the motorcycle's rightful owner. The plaintiff claims compensatory damages, costs and interest, punitive damages, reasonable attorney's fees, interest pursuant to General Statutes § 37-3a, and "such other and further relief as the court deems just and equitable." In their Amended Answer and Special Defenses, dated May 25, 2000, the defendants deny the allegations of conversion, negligence, and resulting damages.
The defendants also have raised four special defenses. The first alleges that the plaintiff's action is "barred by the statute of limitations."[1] The second claims that the action "is precluded by the doctrine of res judicata" due to the Connecticut Department of Motor Vehicles (DMV) investigation which found against the plaintiff. The third alleges that all acts of the defendants were completed "in accordance CT Page 15664 with Connecticut General Statutes § 14-150." The fourth special defense raises the issue of standing,[2] as it asserts that the plaintiff was not the actual owner of the motorcycle in question at the time the vehicle was allegedly converted.
The matter was tried to the court, with evidence presented on July 28 and August 1, 2000. Trial briefs were submitted and argument was delivered on August 18, 2000. All parties were represented by able and experienced counsel, who presented numerous exhibits for the court's review. Testimony was received from Shawn Barron; Gregory Gorr, of the Hartford Police Department; Bradford Bell; Leon Green and Bozena Fraczek, employees of the defendant corporation. After hearing and due consideration of the applicable principles of law, the credibility of the witnesses[3] and the totality of the evidence,[4] the court finds this matter in favor of the plaintiff, and awards him fair, just and reasonable damages and interest as set forth below.
 I FACTUAL FINDINGS
From the testimony and evidence presented at trial, the court finds the following facts to have been proved by a preponderance of the evidence:
On March 4, 1994, the plaintiff purchased a new 1994 Suzuki motorcycle, model GSXR75, from Suzuki of Western Mass., Inc. in Granby, Massachusetts. The vehicle, bearing vehicle identification number (VIN) JS1GR7BA6R2101509, cost $7,700.[5] (Exhibit 1.) The plaintiff, who lived in Holyoke, Massachusetts at the time of the purchase, kept the motorcycle at his home. He received the title to the motorcycle from the Massachusetts Department of Motor Vehicles, procured insurance for the vehicle, registered it in his own name, and received license plates allowing vehicle to be used upon public highways. (Exhibit 2.) The plaintiff kept the registration papers in a locked compartment underneath the motorcycle's seat. The plaintiff had installed several improvements which served as distinguishing features upon the motorcycle, including neon lights, a vehicle bra, a radar detector, and a jet exhaust kit.
Thereafter, in August of 1994, the plaintiff agreed to sell the motorcycle to his friend, Todd Sullivan, for the sum of $7,500. On August 13, 1994, the plaintiff; who was then approximately nineteen years old, filled out the reverse side of the Massachusetts title form and signed it. Sullivan signed the form as well, but neither one entered the "date" of the transaction: these spaces were left blank. The plaintiff intended to deliver the title to Sullivan when he had received the designated payment. When he filled out the form, he indicated that the odometer read CT Page 15665 8,500 miles.
The plaintiff permitted Sullivan to operate the motorcycle although he was unable to immediately acquire the funds necessary to purchase the vehicle. Both the motorcycle and the physical title remained in the plaintiff's possession. Although the plaintiff intended to sell the motorcycle to Sullivan, he never removed his assigned license plates from the vehicle. The sale transaction was never consummated by the parties.
On the evening of August 19, 1994, the plaintiff drove the motorcycle to Sullivan's home in West Springfield, Massachusetts. The motorcycle was left upon Sullivan's premises through the night, while the plaintiff slept over. In the morning, both the plaintiff and Sullivan noted that the motorcycle was no longer in the driveway. They reported to the West Springfield Police Department (WSPD) that the motorcycle had been stolen from Sullivan's property. The plaintiff also reported the theft to his insurer, and made a claim for reimbursement of the value of the motorcycle. The carrier has contested that claim, and litigation concerning that matter remains pending, without resolution, in the state of Massachusetts.
On November 19, 1994, Officer Gregory Gorr, of the Hartford Police Department (HPD), responded to a call concerning a motorcycle that had been left on Woodland Street for several days. Gorr had only accumulated three months of active police experience at that time. He mistakenly recorded the motorcycle's VIN as "JS1GR7BA," having only eight, not seventeen numbers. With this incomplete data, he contacted his dispatcher, asked for information as to whether a vehicle with that eight number VIN had been reported stolen, and received a negative response.[6]
Gorr arranged to have the vehicle towed by Benton, a license towing company operating under contract with the City of Hartford. Gorr still suspected that the motorcycle had been stolen, and recorded this suspicion by checking the applicable box upon the Benton form utilized by HPD officers to transmit information about vehicles that were to be towed. (Exhibit 6.) There, he also noted the incomplete VIN and recorded his finding that there was no visible damage to the motorcycle at the time he found it: Gorr had specifically examined the condition of the vehicle and carefully noted the absence of damage in an effort to protect the tow operator from facing future charges of having caused damage to the vehicle. (Testimony of Gregory Gorr.)
A Benton representative responded to the scene and removed the motorcycle to Benton's premises at 85 Benton Street in Hartford. Benton's employee Fraczek claimed that upon determining the vehicle's accurate VIN, the company's personnel had contacted HPD to see whether they had CT Page 15666 any information concerning the ownership of the motorcycle, and that a negative response was received. No evidence was submitted which indicated that any Benton personnel ever opened or inspected the motorcycle's storage compartment in an effort to locate the vehicle's registration or to establish the identify of owner. The defendants made no further inquiries about the motorcycle's ownership from November 19, 1994.
Thereafter, in December 1994, Frank Trubisz[7] filed an H-100 form with the Department of Motor Vehicles (DMV). (Exhibits 14, 23.)[8]
Through the H-100 form, which bears the DMV designation "Unclaimed Motor Vehicle or Intent to Sell," Trubisz communicated Benton's intention to sell a Suzuki motorcycle, bearing VIN JSIGR7BA6R2101509.[9] He also indicated thereon his determination that the motorcycle was worth only $35, an amount that would have been paid to Benton upon sale of a destroyed vehicle to a junkyard, notwithstanding Gorr's documents which indicated there was no damage to the vehicle at the time it was retrieved by the towing company. (Exhibits 14, 23; see also Exhibit 6.)[10] In response to these submissions, the DMV sent Benton an H-76 form, entitled "Affidavit of Compliance and Ownership Transfer," which Benton could submit to any person who purchased this motorcycle in lieu of a motor vehicle title. (Exhibit 7.)
Benton neither immediately delivered the vehicle to a junkyard nor did it receive the salvage value. Instead, the motorcycle remained at the Benton facility for almost seven months, notwithstanding the facts that no storage fees were paid, the vehicle occupied a full parking space, and the company's usual practice was to transfer such vehicles to a nearby junkyard after a few months. During this period, Benton never advertised the vehicle for sale. Neither Fraczek nor Benton made any efforts to obtain further information about the vehicle's owner. During this period, while the vehicle remained upon the Benton premises the towing company made no repairs or improvements to the motorcycle.
Through Fraczek, Benton subsequently transferred title of the motorcycle to Green, completing the H-76 form as a motor vehicle transfer document and recording reflecting that the transaction took place on June 9, 1995. At that time, Fraczek had worked at Benton for approximately seven years, in a management position: Green had been employed by Benton for approximately two years, working as an auto body repair technician.[11] Green claimed to have paid $200 for the motorcycle. Fraczek claimed to have received this amount from Green, her subordinate and Benton's employee, in exchange for a vehicle she described as "smashed" and of value for salvage purposes only, even though Trubisz had previously indicated the vehicle was worth only $35. CT Page 15667
On the H-76 form bearing the date June 9, 1995, it is of note that the name and Waterbury address of the defendant Bradford Bell has been written in the space allotted for identification of the "owner" of the vehicle which has been transferred to the "buyer" identified as Leon Green. (Exhibit 7.) The document is signed by Bozena Fraczek for the "seller" of the vehicle, Benton Auto Body, Inc. (Exhibit 7.) No explication was tendered at the time of trial for the fact that the defendant Bell's name and address appear on the H-76 form ostensibly used in lieu of a formal title for Benton's transfer of the motorcycle to Green in June of 1995. Appearance of Bell's name upon this document, designating him as the "owner" of the vehicle prior to Green's purchase, with the inconsistencies upon the H-100 forms utilized by Benton as described above, causes the court to give little credit to the DMV submissions submitted over Fraczek's signature.
Green claimed to have arranged to a number of repairs to the motorcycle while he owned it, but he was unable to produce any receipt for work that had been performed on the vehicle, and he provided no clear evidence concerning the exact nature of the repair work, nor of the specific cost incurred. He claimed that a few months thereafter, notwithstanding his investment, he decided to sell the motorcycle. To procure a buyer for the motorcycle, Green claimed that his brother had placed a classified advertisement in the Hartford Courant. Green further claimed that the defendant Bell, from Waterbury, was the sole respondent to this HartfordCourant ad. Green also claims that Bell paid him $1,000 in cash and that he retained all of the proceeds, apparently without paying for theHartford Courant advertising space. As neither Bell nor Green maintained any invoice, receipt or written record of the transaction, and as neither party could recall the date of this transaction, which ostensibly netted Green $1,000 in cash, the court attributes little weight to their testimony concerning this transfer.
A Q-1 DMV form, dated January 10, 1996 and designated "Supplemental Assignment of Ownership and/or Bill of Sale," indicates that the motorcycle was transferred from Green to Bell, over a year from the November 1994 tow date. (Exhibit 8.) Green, who had obtained the Q-1 form from Benton through Fraczek, provided the document for Bell to use when registering the vehicle at the DMV. Bell was unable to register the motorcycle at first, however, because upon his initial approach to the DMV branch in Waterbury, the motorcycle was identified as a stolen vehicle. Subsequently in 1996, the DMV rescinded this classification, and allowed the motorcycle to be registered in Connecticut.
It was not until mid-March of 1996 that the plaintiff had additional communication with the WSPD or any public or private agency concerning the motorcycle. At that time, the plaintiff received both a phone call CT Page 15668 and letter from the WSPD reflecting information about the vehicle. Through the WSPD, the plaintiff was enabled to contact the defendant Bell, who had the motorcycle in his possession at his home in Waterbury. The plaintiff visited Waterbury and confronted Bell, who allowed him to examine the vehicle, but refused to cede possession. Bell told the plaintiff that he had paid Benton, not Green, $3,000, not $1,000, although the latter figure is noted on the Q-1 form. (Exhibit 8.)[12] When the plaintiff saw his motorcycle in Waterbury, it was in intact condition, nearly identical to that in which he had last seen it, still bearing the installed distinguishing features, with the exception that the ignition had been replaced. The plaintiff noted that the vehicle's VIN was the same as that of the motorcycle that was stolen from him in 1994. While Bell claimed to have invested approximately $2,000 for repairs to the motorcycle after it came into his possession, he produced no receipts or other documents to support his testimony concerning these matters. In view of Bell's testimony concerning the seller of the motorcycle, which is inconsistent with the Q-1 form and the evidence obtained from Green, and in view of inconsistencies in the financial aspects of his testimony, the court attributes little weight to the statements proffered through this witness.
Shortly after the plaintiff came to Waterbury to meet with Bell, and prior to the commencement of this litigation, the motorcycle was sold for $4,500 to Christopher Howarth, who is not a party to this action.
 II CONVERSION
Through the First, Second, Third and Seventh counts of his Complaint, the plaintiff has alleged that he owned the Suzuki motorcycle,[13] and that it was converted by the defendants Benton, Fraczek, Green, and Bell, thereby depriving him of his lawful interest in the property. The defendants contend that they acted properly and lawfully in this matter, and that they are not liable to the plaintiff; or to any person, for conversion. The court finds this issue in favor of the plaintiff.
"`The tort of conversion boasts a well established definition . . . Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner's . . . . [T]here are two general classes of conversion: (1) that in which possession-of the allegedly converted goods is wrongful from the outset; and (2) that in which the conversion arises subsequent to an initial rightful possession.' . . . Luciani v. Stop Shop Cos., 15 Conn. App. 407, 409-419, 544 A.2d 1238, cert. denied,209 Conn. 809, 548 A.2d 437 (1988)." (Citations omitted.) Maroun v.CT Page 15669Tarro, 35 Conn. App. 391, 396, 646 A.2d 251, cert. denied, 231 Conn. 926,648 A.2d 164 (1994). See also Wellington Systems, Inc. v. Redding Group,Inc., 49 Conn. App. 152, 169, 714 A.2d 21 (1998); Zanoni v. Hudson,48 Conn. App. 32, 38, 708 A.2d 222 (1998); Policy v. Air One, Inc.,46 Conn. App. 573, 577, 700 A.2d 71, cert. denied, 243 Conn. 937,702 A.2d 644 (1997). Thus, our law clearly contemplates that "[c]onversion may arise subsequent to an initial rightful possession" such as occurred under the circumstances of this case. Suarez-Negrete v.Trotta, 47 Conn. App. 517, 521, 705 A.2d 215 (1998). To establish a prima facie case of conversion under the second prong of the approved test set forth in Luciani v. Stop Shop, supra, a plaintiff must demonstrate (1) that the property at issue belongs to him; (2) that the defendants deprived the plaintiff of his property for an indefinite period of time, (3) that the defendants' conduct was unauthorized, and (4) that the defendants' conduct harmed the plaintiff Zanoni v. Hudson, supra,48 Conn. App. 38-39. The facts of this case demonstrate that the plaintiff has met his burden of proof on all four of the issues relevant to his claims of conversion, as to each of the four defendants in this matter.
As discussed below in response to the defendants' Fourth Special Defense, the subject of the plaintiff's ownership of the vehicle is established through his possession of the title to the vehicle and his possession of the vehicle itself; under the legal standards established in this state and in the Commonwealth of Massachusetts. See Part IV. D. The acts of the Benton defendants in storing the motorcycle after it came into their possession, without making due and necessary efforts to identify or locate its owner, and their subsequent transfers of the vehicle among themselves and to Bell, who was known to them as early as June of 1995, caused the plaintiff to be deprived of his property for a number of years, causing him harm. See Part III, discussing the plaintiff's claims of negligence against the defendants. Although the defendants claim that they were authorized to transfer the motorcycle through the relevant DMV documents, as noted herein, the H-76, H-100 and Q-1 forms bear little indicia of reliability, and cannot serve as a defense to the element of conversion. See Part IV. C. Zanoni v. Hudson,
supra, 48 Conn. App. 38-39.
As to the unauthorized nature of the defendants' conduct, a number of aspects of the evidence presented in this matter established that the Benton defendants actively converted the plaintiff's motorcycle, notwithstanding the fact that they initially obtained lawful possession of the vehicle. The plaintiff presented uncontroverted evidence that he had kept the motorcycle's registration papers in a compartment underneath the vehicle's seat. There was no evidence from which the court reasonably could have determined that this area particular of the motorcycle had sustained serious damage, or that the contents of the compartment had CT Page 15670 been destroyed. Although reach had the opportunity to do so, there was no evidence from which the court could reasonably conclude that Trubisz, Fraczek, or Green had attempted to or successfully opened and inspected this compartment, but failed to locate the registration papers. Similarly, there was no evidence from which the court could reasonably infer the plaintiff's registration papers had ever been removed from this space by any person who had contact with the vehicle before Benton, Trubisz, Fraczek, and Green. Therefore the evidence supports the logical inference that while Benton, Trubisz and Fraczek knew or should have known that the motorcycle's registration paperwork or other identificatory information would have been kept in the vehicle's under-seat compartment, they negligently or intentionally failed to look in that place, and thereby negligently or intentionally failed to do what was necessary and appropriate to learn the name of the motorcycle's owner. These actions cannot serve as the basis for a conclusion that the Benton defendants acted in an authorized manner when they retained possession of the vehicle, pursuant to the applicable rules of Luciani v.Stop Shop Cos. and Maroun v. Tarro. Similarly, Bell has presented no credible reason why neither he nor his representative[14] ever examined the compartment at issue.
As noted, then, the evidence presented in this matter further supports the reasonable inference that neither Fraczek, nor Green, nor Bell, nor any Benton employee ever opened or inspected the motorcycle's storage compartment which the evidence established to contain the vehicle's Massachusetts registration, and the identification of Barron as its owner. The evidence further supports the inference that the Benton defendants did not fully utilize the HPD as a resource for determining the vehicle's ownership, as the court finds credible Gorr's testimony that his agency was able, in November of 1994, to provide information concerning vehicles that had been reported stolen in the state of Massachusetts. The court cannot credit the defendant Fraczek's testimony on this subject, which was contrary to the evidence provided by the disinterested witness Gorr, and as no contemporaneously recorded documentation or other evidence was tendered to the court in support of her claim that the HPD had been contacted with the full VIN after Benton received the vehicle on November 19, 1994. Accordingly, the court attributes little weight to the defendants' submission that Fraczek and Benton made a good faith effort, but were unsuccessful, in locating the vehicle's owner after they assumed dominion and control of the vehicle.
The evidence reveals that when the motorcycle was towed to Benton, on November 19, 1994, Trubisz completed the entry upon his towing form to add nine numerals to the YIN recorded by Gorr. The towing form included the investigating police officer's notation that the vehicle was "suspected stolen." Exhibit 6. From the incompleteness of the officer's CT Page 15671 VIN entry, and from his own addition of nine numerals, Trubisz, as Benton's owner, knew or should have known that HPD had not yet been provided with the vehicle's complete VIN. As Benton's owner, Trubisz further knew or should have known that therefore HPD had not had a reasonable opportunity to fully and adequately search its records, and those of sister states, to learn whether the vehicle had been reported stolen. Trubisz, or another representative from Benton, could and should, without burden, have notified HPD of the incomplete VIN number and of Benton's possession of the vehicle. As admitted by Fraczek, in November of 1994 Benton was able to obtain such information through the use of the HPD personnel known as the "F-3 dispatcher." Based upon the credible testimony of Gorr, the court finds that had this step been taken, HPD would have been able to contact agents of the state of Massachusetts, and learn that Barron had reported the vehicle as stolen. The evidence establishes a clear basis for Fraczek's reluctance to make timely effective contact with HPD concerning the Suzuki motorcycle: the court finds that Fraczek's admission that she did not attempt to identify the vehicle's owner because she and Benton assumed that the owner had already been paid the motorcycle's value by an insurance company, supports the inference that it was in the defendants' best interests not
to locate the owner, but rather to assume possession and control of this valuable motor vehicle, so it could be put to their own use.
Regarding the relevant condition of the motorcycle, the court is able to attribute little weight to the defendants' claims and testimony that the vehicle was "trashed" or seriously damaged at the time it was retrieved by Benton, transferred to Green, or transferred to Bell. The court finds Fraczek's assertion that this severely damaged vehicle, fit only for salvage and with a self-stated value of $35, was kept on Benton's property, occupying a full parking space and accruing storage charges, for a period of over six months, to be inconsistent with her admission that Benton made no attempt to advertise their possession of the vehicle or to locate the vehicle's owner through other means, as the owner would be responsible for paying the storage fees. Given the court's well-founded concerns about the reliability of the defendants' submissions of accurate paperwork to the DMV, as explained throughout, the court is able to attribute little weight to Fraczek's claim that Benton intended to sell the motorcycle for salvage, but that she was delayed in doing so because DMV failed to supply an H-76 form in a timely manner.
The testimony provided by Green and Bell concerning the condition of the motorcycle during the times in question casts further doubt upon the evidence submitted by the defendants in this case. Both Green and Bell claimed that they had invested hundreds of dollars into improvements and repairs for the motorcycle, after they obtained its possession. CT Page 15672 Notwithstanding the various motorcycle repair shops which allegedly performed services upon the motorcycle, and notwithstanding all of the defendants' expenses, the court was not provided with neither a single estimate of work required, nor any receipt or invoice defining the exact work that allegedly was performed. In his responses to the plaintiff's interrogatories, the defendant Green had provided information concerning the extent of the repairs and improvements that he had provided for the vehicle: this information was inconsistent, however, with his testimony at trial, placing his credibility further in question.
Under all of these circumstances, the court finds the only credible information concerning the condition of the Suzuki motorcycle to have been provided by the plaintiff and Gorr. The plaintiff testified that he had agreed to sell the comparatively new vehicle for $7,500, a price which Sullivan was willing, although unable, to pay. This price is relatively consistent with the corroborating information upon the invoice from Suzuki of Western Mass., Inc., provided to the plaintiff approximately five months before the loss of his vehicle, before he installed the additional components identified above. The credible testimony of the only non-party witness to the matter, Gregory Gorr, provided the court with no basis for discrediting the information upon his written records, indicating that there was no damage to the vehicle when he observed it on November 19, 1994, prior to its transfer to Benton. (Exhibit 6.) The court therefore concludes that when the defendants Benton, Green and Bell obtained possession of the vehicle, it was in substantially the same, undamaged condition as it had been when under the plaintiff's dominion and control, and that it had retained its monetary value.
The court finds little basis, within the evidence, for crediting Benton's stated intention to sell the vehicle for salvage value. Although the defendants have claimed that the motorcycle had severe damage to its body and to its mechanical components at the time they acquired it, this claim is inconsistent with Gorr's identification that the vehicle was in an undamaged condition when he located it. Although the Benton defendants protest that the vehicle was designated for the junkyard within a month after they obtained it, the towing company failed to deliver the motorcycle to a salvage company, and failed to obtain their $35 in return. The court finds incredible the Benton defendant's claim that they permitted this "damaged" vehicle to take up an entire parking space upon its lot, when their admitted practice was to sell such vehicles to a junkyard after only a few months had passed. For at least a seven month period, the Benton defendants caused and allowed the motorcycle to remain on their premises, ostensibly accruing storage fees that would be paid by the owner who redeemed the vehicle. This proposition is inconsistent, however, with the fact that during this period the defendants also claim CT Page 15673 to have no idea who would ever be liable for paying those fees; with their admitted failure to have advertised the vehicle for sale; and with the fact that Fraczek was relying upon the presumption that whoever actually owned the motorcycle already had been paid by an insurance company for its loss.
The preponderance of the evidence supports the inference[15] that despite the defendants' claims, the formal sale of the vehicle from Benton, through Fraczek, to Green and to Bell took place on paper only. In addition to the information already set forth, there are a number of other reasons why the testimony of Fraczek and Green, on the subject of this sale, should be discredited. While Fraczek claimed to have completed and signed the H-76 form to show that a 1994 Suzuki VIN JS1GR7BA6R2101509 had been sold to Green, she did not indicate the "sales price" upon that form. (Exhibit 7.) In the box labeled "Owner Information (if known)" upon the H-76 form, as noted, the name Bradford Bell was written, with a stated address of "599 Willow St., Waterbury Ct. 06107". Neither Benton, Bell, Fraczek nor Green maintained any receipts or other documentation concerning this alleged sales transaction.[16] While Fraczek claimed that she charged Green $200 for the motorcycle in an effort to recoup Benton's unpaid storage fees, there was insufficient evidence from which the court could conclude that storage fees were ever recorded for or assigned to this vehicle or the space it occupied during its stay at Benton. Although Fraczek maintains that Benton held a lien against the motorcycle for accrued storage charges, there was insufficient evidence from which the court could conclude that either Benton or Fraczek at that time, or ever, contacted Bradford Bell, the "owner" of the vehicle as identified in the H-76 form, in an effort to recover any portion of such storage fees as may have accumulated. While Fraczek and Green maintain that the motorcycle lacked an ignition system at that time, Fraczek had responded "yes" to the H-76 form's inquiry: "Was the vehicle at the time of sale in condition for legal operation on the highway (s) of this state?" Despite this response, both Fraczek and Green claimed that the motorcycle was not operable because it was "smashed." Furthermore, while the defendant Green provided several reasons why he would have paid $200 for this vehicle, the court cannot credit these statements.[17]
A number of other circumstances, presented by the evidence in this case, give rise to serious questions concerning the nature of the defendants' intentions concerning the motorcycle at issue, and concerning the degree of candor with which the DMV documents were completed. As noted, the court was provided with two versions of the H-100 forms submitted by Benton which reflect inconsistent entries as to, inter alia, the date of the application. (Exhibits 14, 23). The defendants produced insufficient evidence to explicate the purpose for these inconsistencies, leaving the court to question the reliability of the CT Page 15674 written communications that Benton, or its agents, had with DMV. In addition, the court has noted that on the H-76 form, ostensibly used by Benton, through Fraczek, as a substitute title for purposes of transferring the motorcycle to Green on June 9, 1995, the vehicle's "owner" is stated thereupon to be Bradford Bell, of Waterbury, Connecticut. (Exhibit 7.) This document was produced by the DMV, and has evidently remained a part of the official DMV file concerning the motorcycle in question. The 1997 H-76 document produced by the DMV thus reflects the same name and address attributed to the defendant Bell as that which was used by Bell when he appeared at Benton Auto Body, Inc. in January of 1996, to purchase the very same motorcycle from Green. (Exhibit 8.) While this simultaneous appearance of Bell's name on Exhibit 7 and Exhibit 8 may have arisen from scrivener's error, or from coincidence, there was insufficient evidence from which the court could so reasonably conclude. Under the circumstances of this case, the court finds that Bell's name, appearing on the form used by Benton, Fraczek and Green in June of 1995, and by Green and Bell in January of 1996, casts great doubt upon the veracity of any of the defendants with regard to any transactions involving the motorcycle at issue. This evidence supports the reasonable inference that Bell's name was at least known to Benton and Fraczek as early as June 9, 1995, they had intended to transfer the vehicle to him months before January 1996.[18] Fraczek has admitted that she presumed that whomever owned the motorcycle had already been paid by an insurance company for the loss of its use: this assumption is consistent with her apparent motive to retain dominion and control of the vehicle, and to use it to benefit herself and Benton.
Based upon the foregoing principles of law, and the facts found under the totality of the circumstances presented here, the court finds that the defendant has met its burden of proving conversion as to each of the defendants. See Zanoni v. Hudon, supra, 48 Conn. App. 309; Maroun v.Tauro, supra, 35 Conn. App. 396. In reaching its decision on this subject as on all the issues in this case, the court has relied upon the credible testimony and evidence establishing the plaintiff's ownership of the motorcycle, the value of the vehicle at the time of the defendants' conversion, the defendant's lack of appropriate attention to the responsibility for identifying and locating the vehicle's owner, and the defendant's conversion of the Suzuki subsequent to its initial rightful possession of the vehicle. See Suarez-Negrete v. Trotta, supra,47 Conn. App. 521. Although the great majority of the defendants' testimony and documentary evidence must be discredited, the court has reached its opinion without resorting to inferring the opposite of that evidence, solely upon its disbelief of those assertions. See, e.g., Statev. Copas, 252 Conn. 318, 348, 746 A.2d 761 (2000). Assessment of the credibility of the statements made by the witnesses at trial has been, however, critical to the court's determination of the issue of CT Page 15675 conversion. See Id.
Accordingly, this issue is found in favor of the plaintiff; and he is entitled to an award of fair and just damages for his loss.
 III CLAIMS OF NEGLIGENCE
In the Fourth, Fifth and Sixth Counts of the complaint, the plaintiff further complains that the defendants Benton, Fraczek and Green caused him to suffer harm as the result of their careless and negligent failure to identify him as the owner of the towed motorcycle at issue, to locate him and communicate with him concerning the availability of the vehicle. The defendants protest that they had no duty to the plaintiff; and that they therefore neither breached an obligation owed to him, nor caused him damages under this legal theory. The court finds this issue in favor of the plaintiff.
In considering this aspect of the plaintiff's claim, the court has carefully reviewed the relevant aspects of the complaint. The allegations of negligence are presented first in the Fourth Count, directed against Benton. Those allegations are reiterated against Fraczek and Green, Benton's employees, through the Fifth and Sixth Counts. The Fourth Count incorporates the factual basis for the conversion claims set forth in the First, Second and Third Counts, and includes the following language which is also made applicable to the Fifth and Sixth Counts:
 8. The defendant was careless and negligent in one or more of the following ways:
 (a) The defendant failed to make reasonable efforts to contact the plaintiff when it came into possession of the plaintiff's property although it could and should have done so.
 (b) The defendant failed to notify the plaintiff that it had come into possession of the plaintiff's property, although it could and should have done so.
 9. As a result of the defendant's conduct as aforesaid, the plaintiff suffered damages.
(Emphasis added.)
Significantly, no express allegations of intentional misrepresentation or CT Page 15676 fraud are contained in the relevant counts, or elsewhere in the complaint.[19]
The general principles affecting negligence litigation are well known. "The elements in a negligence cause of action are duty, breach of that duty, causation and damages. Doe v. Manheimer, 212 Conn. 748, 755,563 A.2d 699 (1989), overruled in part on other grounds, Stewart v. Federated Dept. Stores, Inc., 234 Conn. 597, 608, 662 A.2d 753 (1995). To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct was the legal cause of the injuries. See Wu v.Fairfield, 204 Conn. 435, 438, 528 A.2d 364 (1987); Hearl v. WaterburyYMCA, 187 Conn. 1, 4, 444 A.2d 211 (1982); W. Prosser W. Keeton, Torts (5th Ed. 1984) § 41, p. 263. "The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct.' (Internal quotation marks omitted.) Doe v. Manheimer, supra, 757 . . . . The second component is proximate cause. "Proximate cause establishes a reasonable connection between an act or omission of a defendant and the harm suffered by a plaintiff.' W. Prosser W. Keeton, supra, § 41, p. 263. "The Connecticut Supreme Court has defined proximate cause as [a]n actual cause that is a substantial factor in the resulting harm . . . . The substantial factor test reflects the inquiry fundamental to all proximate cause questions, that is, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.' (Citations omitted; internal quotation marks omitted; footnote omitted.)" Medcalf v. Washington Heights CondominiumAssociation, 57 Conn. App. 12, 16-17, ___ A.2d ___ (2000).
 A DUTY TO THE PLAINTIFF
The plaintiff claims that, under the circumstances of this case, he was owed a duty of reasonable care from the company which towed his motorcycle and the company's employees who were responsible for the vehicle's continued presence at Benton's facility. The defendants first protest that they owed no duty to the plaintiff; as he did not own the motorcycle which the Hartford Police Department had delivered into their possession. The defendants further argue that even if Barron did own this motorcycle, they owed no special duty to him. The genesis of the relevant duty to the plaintiff rests upon his ownership of the motorcycle at issue, which has been determined by the court in his favor. See Part W. D., below. Having so found, the court further determines that the Benton defendants owed a duty to Barron. CT Page 15677
The determination of whether a duty exists between the owner of the motorcycle and the relevant defendants presents a question of law. Lodgev. Arett Sales Corp., 246 Conn. 563, 571, 717 A.2d 215 (1998). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) O G Industries, Inc. v. New Milford, 29 Conn. App. 783,790, 617 A.2d 938 (1992), aff'd, 229 Conn. 303, 640 A.2d 110 (1994).
The plaintiff has argued that when a licensed towing company, such as Benton, has towed a purportedly stolen motorcycle, and the vehicle remains in its possession, the company has the obligation to use reasonable efforts to find and notify the vehicle's owner of its current status. The plaintiff submits that these reasonable efforts include examining the towed vehicle, including its locked compartments, to determine the availability of registration documents or other indicia of ownership. The defendants deny that any such duty exists on the part of the towing company. The court finds that the statutory good faith and reasonable diligence standards mandated by § 14-150, as well as common law standards, support the position espoused by the plaintiff; that Benton had the legal duty to ascertain the identity of the motorcycle's owner before undertaking any further action. This duty included the towing company's obligation, especially before the sale of the towed vehicle, to make reasonable efforts to locate the owner: these reasonable efforts would include looking into the vehicle glove box or other compartment where registration and ownership documents would customarily be stored.
This duty is established, as a matter of law, through General Statutes § 14-150 (g),[20] which requires the defendant towing company to determine, in good faith, the value of the abandoned vehicle. If a goodfaith value of the vehicle is over $500, § 14-150 (g) also requires that "if the last place of abode of the owner of such motor vehicle is known to or may be ascertained by such garage owner or keeper by theexercise of reasonable diligence, notice of the time and place of sale shall be given him . . . ." (Emphasis added.) Id. If a good faith valuation of the vehicle is less than $500, the towing company must notify the vehicle's owner of an intent to sell the vehicle if his/her address is known. Under the circumstances of this case, where the court has found the vehicle to have been substantially undamaged at the time it was discovered by Gorr, the value of the vehicle exceeded $500 at the time Benton assumed dominion and control over the vehicle. Therefore, the defendant towing company was required to exercise reasonable diligence in identifying and locating Barron, the vehicle's owner, before the disposition process was initiated. CT Page 15678
Our Appellate Court has attended to the meaning of the terms "diligence," "reasonableness" and "good faith" as they are used in Connecticut's legal process. "`Diligence,' defined by Webster's Third New International Dictionary as "persevering application: devoted and painstaking application to accomplish an undertaking, ' and as "the attention and care required of a person . . . [as] opposed tonegligence, '. . . implies at the least that reasonable diligence is required. Thus . . . that standard is substantially equivalent to the "reasonable efforts' standard implied by our cases." (Citations omitted.)Phillipe v. Thomas, 3 Conn. App. 471, 474, 489 A.2d 1056 (1985). "The difference between the good faith and reasonable efforts standards is the difference between a subjective and an objective standard. [G]ood faith . . . in common usage . . . has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation . . . . It has been well defined as meaning [am honest intention to abstain from taking an unconscientious advantage of another, even through the forms ortechnicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious . . . . The determination of good faith involves an inquiry into the party's motive and purpose as well as actual intent." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 474-75. "Reasonableness, on the other hand, is an objective standard, involving an analysis of what a person with ordinary prudence would do given the circumstances, without accounting for any particular knowledge or skill . . . . In contracts as in tort cases, [t]he test is external, not subjective; that is, the question is how would a person of ordinary prudence in such a situation have behaved, not how did the defendant in fact behave . . . . Whether the plaintiff's actions constituted reasonable efforts . . . is a factual determination for the trial court." (Citations omitted; internal quotation marks omitted.) Phillipe v.Thomas, supra, 3 Conn. App. 475.
Utilizing these standards, the court concludes that under the circumstances of this case, the operation of § 14-150 (g) imposed upon Benton a duty to use good faith and reasonable efforts to identify and locate the owner of the motorcycle in question before offering it for sale. This duty was further established by the supposed contract that existed between Benton and the vehicle's owner, to provide storage services in exchange for a fee. O G Industries, Inc. v. New Milford,
supra, 29 Conn. App. 790. The evidence discloses that Benton failed to make reasonable efforts, failed to use due diligence, and failed to exercise good faith in identifying or locating the motorcycle's owner. Given the relatively undamaged condition of the motorcycle when it came CT Page 15679 into Benton's possession, the defendant towing company was charged with the knowledge that if it did not contact the vehicle's rightful owner, he would suffer the loss of this valuable item. Reasonable efforts, under the circumstances, would have included searching compartments upon the vehicle to determine whether the owner had stored registration or other identificatory documents for reference under circumstances such as those which actually occurred. The court finds that had Benton, or any of its agents or employees, examined the motorcycle's storage compartments, that they would have found the motor vehicle documentation which Barron had prudently stored cached there. The defendant towing company and its agents and employees, Fraczek and Green, did not honor their duty in this matter and as a result, the foreseeable loss to the vehicle's owner, the plaintiff; took place.
 B CAUSATION
As noted, in a case such as this, the plaintiff bears a burden beyond that of proving negligence, as he must establish the elements of causation as well. "In order for legal causation to exist, both actual cause and proximate cause must be present. Coste v. Riverside Motors,Inc., 24 Conn. App. 109, 113, 585 A.2d 1263 (1991). Actual cause requires evidence that the plaintiff's injury would not have occurred in the precise way that it did without the defendant's conduct. Id. Proximate cause is defined as an actual cause that is a substantial factor in the resulting harm. The `test' for proximate cause is whether the defendant's conduct was a "substantial factor' in producing the plaintiff's in . . . ." This substantial factor test reflects the inquiry fundamental to all proximate cause questions, namely, "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence . . . ." (Citations omitted; internal quotation marks omitted.)." (Citations omitted.) Shegog v. Zabreclcy,36 Conn. App. 737, 745, 654 A.2d 771, cert. denied, 232 Conn. 922,656 A.2d 670 (1995). See also Stewart v. Federated Department Stores,Inc., 234 Conn. 597, 607-08, 662 A.2d 753 (1995). "If a defendant's negligence was a substantial factor in producing the plaintiff's injuries, the defendant would not be relieved from liability for those injuries even though another force concurred to produce them. Miranti v.Brookside Shopping Center, Inc., [159 Conn. 24, 29, 266 A.2d 370 (1969)] . . . . (Citation omitted.) D'Arcy v. Shugrue, 5 Conn. App. 12, 24-25,496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985)." (Quotation marks omitted) Wagner v. Clark Equipment Co., 243 Conn. 168,180, 700 A.2d 38 (1997).
The Benton defendants may claim that even if they were negligent, CT Page 15680 Bell's purchase of the vehicle, and his failure to deliver the motorcycle to Barron upon his demand, constitute intervening and/or superseding events which relieve them of any liability. The court finds that under the circumstances of this case, where the Benton defendants breached their duty to the plaintiff by placing his motorcycle into the stream of commerce, any subsequent transfer of the vehicle cannot legally extinguish their responsibility for his loss. "`[W]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.' (Internal quotation marks omitted.) Stewart v.Federated Dept. Stores, Inc., [supra, 234 Conn. 607-08]." Edwards v.Tardif supra, 240 Conn. 610, 617, 692 A.2d 1266 (1997). "`Whether a superseding cause was of such a character as to prevent an act of negligence of the defendant from being a substantial factor in producing a plaintiff's injury is ordinarily a question of fact. Corey v.Phillips, [126 Conn. 246, 254, 10 A.2d 370 (1939). Roden v. ConnecticutCo., 113 Conn. 408, 413, 155 A. 721 [1931].' Colligan v. Reilly,129 Conn. 26, 30, 26 A.2d 231 (1942)." Wagner v. Clark Equipment Co.,Inc., supra, 243 Conn. 180.
Here, the Benton defendants' acts in failing to locate Barron or to identify him as the owner of the motorcycle, while maintaining possession of the vehicle for a long period of time, significantly increased the risk that the lawful owner would permanently be separated from his property. As such, the Benton defendants' negligence constitutes a substantial factor in causing Barron's loss, and the fact that Bell ultimately both purchased the motorcycle from the defendants, and that the vehicle was subsequently sold to a third party, cannot serve to relieve them of liability. Edwards v. Tardif, supra, 240 Conn. 617.
For the foregoing reasons, the court finds that the Benton defendants' breach of their duty to the plaintiff caused the permanent loss of his vehicle, which is the subject matter of this litigation.
 IV SPECIAL DEFENSES
As noted above, the defendants have raised four special defenses to the plaintiff's cause of action. For convenience, the court has addressed these special defenses serially below.
 A CT Page 15681 STATUTE OF LIMITATIONS
The defendants' First Special Defense claims that the plaintiff should not be permitted to succeed in this matter because his cause of action was time barred by the statute of limitations.[21] The plaintiff contends that his complaint was timely filed, and that no statute of limitations effectively precludes his prosecution of this matter.[22]
The court finds this issue in favor of the plaintiff.
The evidence in this matter indicates that the tort of conversion commenced on December 20, 1994, when the Benton defendants had obtained possession of the motorcycle and established indications of their intention to make use of the vehicle as if it were their own through the submission of the H-100 form.[23] (Exhibit 14.) As to the Benton defendants, the tort of conversion continued at least through January 10, 1996, when the defendant Bell took the vehicle into his possession, and may reasonably be identified as continuing through the course of all the times relevant to this proceeding. Due to the defendants' actions in this case, as described above, the plaintiff was unable to learn that the defendants had established ownership of his motorcycle until March 1996. He commenced his legal action against the defendants by filing his complaint with the court on August 5, 1997.
Two statutes of limitations are applicable to the plaintiff's claims. The conversion claims are subject to the three-year limitation of actions provided by General Statutes § 52-577.[24] That legislation establishes the applicable statute of limitations for non-negligent torts, including the present action, as follows: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of" See D'Occhio v. Connecticut Real EstateCommission, 189 Conn. 162; 182, 455 A.2d 833 (1983) (statute of limitations for conversion is governed by the three years set forth in General Statutes § 52-577). Given a fair construction of § 52-577, the plaintiff's submission of his complaint in August of 1997, within three years of the December 20, 1997 anniversary of the Benton defendants' tort, would fall within the acceptable time allotment: the complaint would also be timely as to the January 10, 1996 tort complained of against Bell. Further assuming that Benton, Fraczek, Green and Bell had continued their tort throughout the period within which the plaintiff; as the result of their actions, was unable to learn the fate of his motorcycle, the complaint would have been filed well within the conversion statute of limitations. Accordingly, the defendants cannot prevail through this aspect of their special defense.
The plaintiff's negligence claims are subject to the limitation of CT Page 15682 actions set forth through General Statutes § 52-584. This legislation provides, in pertinent part: "No action to recover damages for injury to . . . personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ." (Emphasis added.) General Statutes § 52-584 thus establishes the limitation period for actions in which both the losses caused by negligence, and the-identity of the tortfeasor, are immediately recognizable. The statute further anticipates such circumstances as have occurred in this case, however, where a loss may occur but the discovery of the tortfeasor is delayed. In this matter, as discussed above, the plaintiff was deprived of the ability to learn the identity of the Benton defendants who had failed to observe the due standard of care insofar as his vehicle was concerned, for the relevant time period of December 20, 1994[25] until the notification issued by the WSPD authorities in March 1996, which ultimately allowed him to trace the negligent acts back to Benton Auto Body, Inc. No evidence was provided from which the court could conclude anything other than that, under the circumstances of this case, any reasonable efforts by the plaintiff to discover the location of his motorcycle, while it was under the care and custody of the Benton defendants and/or Bell, would have been fruitless. Therefore, the three year provisions of General Statutes § 52-584 would apply to this case, requiring that the action be brought to court no "more than three years from the date of the act or omission complained of." Id. Using the analysis reviewed above, construing the effect of the three year statute of limitations established by § 52-577 for the conversion aspects of this case, the negligence claims are found to have been timely brought within the application of § 52-584. Accordingly, the defendants cannot prevail on this special defense.
 B SECOND SPECIAL DEFENSE — DOCTRINE OF RES JUDICATA
The defendants argue that the plaintiff's claims, presented through this litigation, are barred by application of the doctrine of res judicata. Here, the defendants ask the court to find that the plaintiff had asked the DMV to investigate his claim that his motorcycle was converted and sold by a licensed towing company, that DMV had determined that the company did not violate § 14-150, and to find as well that the DMV's investigation results preclude the plaintiff's direct action in conversion.[26] The plaintiff contends that any inquiry by the DMV was conducted without the opportunity for evidence to be presented and that, as such, the agency's investigation does not establish a barrier to this CT Page 15683 lawsuit. The court finds this issue in favor of the plaintiff
"The judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate . . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies . . . . [W]here a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding. But the scope of matters precluded necessarily depends on what has occurred in the former adjudication." (Citations omitted; internal quotation marks omitted.) Isaac v. Truck Service., Inc., 253 Conn. 416, 422-23,___ A.2d ___ (2000).
"[Plursuant to the ordinary application of the general principles of claim preclusion . . . a valid, final judgment rendered on the merits by a court of competent jurisdiction is an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand . . . . Furthermore, the doctrine of claim preclusion . . . bars not only subsequent relitigation of a claim previously asserted, but subsequent relitigation of any claims relating to the same cause of action which were actually made or which might have been made . . . . [F]or these purposes whether the subsequent claim relates to the same cause of action is to be determined by the transactional test, which is measured by the group of facts which is claimed to have brought about an unlawful injury to the plaintiff; and which also states that [e]ven though a single group of facts may give rise to rights for several different kinds of relief, it is still a single cause of action." (Citations omitted; internal quotation marks omitted.) Isaac v. TruckService., Inc., supra, 253 Conn. 420-21.
"[A] decision whether to apply the doctrine of res judicata to claims that have not actually been litigated should be based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim . . . . [R]es judicata should be applied as necessary to promote its underlying purposes. These purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation CT Page 15684 . . . ." Isaac v. Truck Service., Inc., supra, 253 Conn. 422-23.
In this matter, the defendants claim that the principles of res judicata bar the plaintiff from succeeding in this litigation because a DMV employee had reached the conclusion that Benton Auto Body submitted to and followed the applicable provisions of § 14-150 with regard to the motorcycle in question. (Exhibit D.) In so claiming, however, the defendants fail to observe the test which must be applied determining whether the DMV investigation and conclusion serves to prevent the court from adjudicating the matter. As set forth above, the clear test is not whether an investigation was performed or a conclusion was reached, but whether a final judgment had been issued previously on the specific matters which are raised by the current litigation. Isaac v. TruckService., Inc., supra, 253 Conn. 421. As there was no judgment issued in any prior contested evidentiary hearing or proceeding under the DMV's jurisdiction, the court cannot reasonably find that judicial economy would be promoted, by minimizing repetitive litigation, if the plaintiff's present action was barred. Id., 422-23. As no judgment has previously been imposed on any of the parties to this action, utilization of the res judicata principle could not serve to prevent inconsistent judgments which might undermine the integrity of the judicial system. Id. Furthermore, as there had been no prior judgment on the issues here raised, honoring the defendants' special defense could not operate as a method of providing repose by preventing Benton, Fraczek, Green or Bell from being harassed by vexatious litigation. Isaac v. Truck Service.,Inc., supra, 253 Conn. 422-23.
Accordingly, despite the defendants' vigorous argument on this issue, the doctrine of res judicata, or claim preclusion, is not implicated in this case. The defendants have failed to present any pertinent authority which supports the proposition that the DMV's action constitutes a full adjudication of the issues raised in this litigation. As the controversy between the plaintiff and the defendants had not been fully adjudicated in any DMV proceeding, and as no final judgment has previously been rendered with regard to this controversy, the defendants cannot prevail on this special defense.
 C THIRD SPECIAL DEFENSE — EFFECT OF DEFENDANTS' COMPLIANCE WITH § 14-150
The defendants claim that because Benton and the other defendants complied with the requirements of General Statutes § 14-150, their ostensible adherence to that statute serves as a valid special defense to this conversion action. The plaintiff has argued that the court should CT Page 15685 not credit the defendants' DMV submissions, now contending that because false or misleading information was used upon those documents, the defendants should be granted no credit for the apparent statutory compliance. The court finds this issue in favor of the plaintiff
As noted above, the court ascribes little weight to the defendants' claims that they had fully and fairly complied with the filing requirements established by § 14-150. The defendants in this matter caused, allowed or permitted paperwork to be submitted to the DMV, containing false and misleading information as to the value of the motorcycle in question and as to the ownership of the vehicle. This court finds that the defendants thereby failed to comply with the legal requirements of that statute or with General Statutes §14-64(4),[27] which prohibits false and misleading statements "as to the condition, prior ownership or prior use" of a motor vehicle. See Corona's Auto Parts, Inc. v. Commissioner of MotorVehicles, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533688 (July 13, 1995, Pogue, J.).
The court further bases its conclusion that the defendants failed to properly comply with the mandates of General Statutes § 14-150 upon the finding that, as noted above, they failed to make "good faith" efforts or to use due diligence to identify and locate the motorcycle's owner, failed to make a good faith valuation of the vehicle, and provided false and misleading information to the DMV. Having so found, the court would be required to rely upon contrived, dissembling documents in order to determine that the defendants in fact complied with the statute. This the court is unwilling to do. See Corona's Auto Parts, Inc. v.Commissioner of Motor Vehicles, supra, Superior Court, Docket No. 533688 (court ordered civil fines and other remedies upon acceptance of Commissioner's conclusion that H-100 form submitted by the plaintiff contained false information in violation of General Statutes § 14-150
(i) and § 14-64 (4), albeit the evidence lacked indication of intent to deceive).
Under these circumstances, the defendants' Third Special Defense fails to insulate them from liability for conversion in this matter.
 D FOURTH SPECIAL DEFENSE — PLAINTIFF'S STANDING AS THE OWNER OF THE MOTORCYCLE
The defendants further argue that the plaintiff lacks standing to pursue this action as he had "sold the motorcycle which is the subject of this litigation and was no longer the bona fide owner of the motorcycle CT Page 15686 at the time of any theft from the Plaintiff's residence."[28]
Defendant's Fourth Special Defense dated May 24, 2000. Specifically the defendants claim that because the plaintiff had signed the motorcycle's title, intending to sell it to a third person who had also signed the title form, he could no longer be considered to be the vehicle's owner. As such, he would lack standing to pursue an action in conversion against the defendants. The plaintiff counters that although he intended to sell his motorcycle, that transaction had not taken place, and he remained the vehicle's owner at all times pertinent to this litigation. The court finds this issue in favor of the plaintiff
The evidence discloses that the plaintiff; indeed, intended to sell the motorcycle to his friend, Todd Sullivan. In preparation for this transaction the plaintiff had signed, but not dated, the reverse side of the motorcycle's Massachusetts title form. Sullivan had also signed, but not dated, the form. The plaintiff retained physical possession of both the motorcycle and the title pending Sullivan's delivery of the agreed upon purchase price.
Because the events precedent to this sale occurred in Massachusetts, where both the plaintiff and Sullivan resided at the time, it is proper for this court to apply Massachusetts law in determining whether an effective contract and subsequent transfer of the motorcycle was actually effectuated between them. Although the Massachusetts law applicable to such alleged transactions is substantially the same as the law of Connecticut, the court will rely on cases our sister state in resolving this issue.[29] Under Massachusetts law, for the purposes of this action, the plaintiff remained the owner of the Suzuki motorcycle at all pertinent times.
Much like Connecticut General Statutes § 14-179,[30] M.G.L.A. c.90D, § 15(a), provides that an owner having title to a vehicle "transfers his interest therein, . . . at the time of delivery of thevehicle . . . [At which time, he shall also] cause the certificate [of title] and assignment to be mailed or delivered to the transferee or the registrar." (Emphasis added.) Also similar to Connecticut General Statutes § 14-179 (d), M.G.L.A. c. 90D, § 15(e), provides that "a transfer by an owner is not effective until the provisions of thissection . . . have been complied with . . . ." (Emphasis added.)
Massachusetts' rubric for determining when title passes from the motor vehicle owner to the transferee is set forth in Fireman's Fund Ins.Companies v. Blais, 438 N.E.2d 360, 14 Mass. App. 254, review denied,440 N.E.2d 1177, 387 Mass. 1102 (1982). In that matter, the facts disclosed that upon entry into a conditional contract for transfer of a motor vehicle, the transferor had neither immediately provided the title CT Page 15687 to the transferee, nor mailed the vehicle's newly assigned title to the registry of motor vehicles. Under those circumstance, pursuant to M.G.L.A. c. 90D, § 15, it was held that the transferor had actually "sold" the vehicle to its employee only after the transferee/employee paid off the employer's outstanding loan on the vehicle. See Id., 363. Several days after the transferee took possession of the vehicle, although this "sale" had not yet occurred, he was in an accident involving the vehicle. See Id. Because there was no physical transfer of title, the court held that the transferor's insurance was still in effect, providing coverage for the accident, as the transaction between the parties did not amount to an actual sale or transfer of ownership, even though the transferee was operating the vehicle at issue. See Id. As a condition precedent to a legal transfer, "[the transferor] was required to deliver the certificate of title for the automobile to either [the transferee] or the Registry of Motor Vehicles in order for the transfer of ownership to be effective." Id., 363.
The Massachusetts court relied upon applicable provisions of the Uniform Commercial Code, as adopted by that state, in reaching its opinion concerning the no-sale status involving the parties to Fireman'sFund Ins. Companies v. Blais, supra. As the court explained, "[according to the Uniform Commercial Code, a `sale' consists in the passing of title from the seller to the buyer for a price. GL. c. 106, § 2-106 (1). While the Code instructs us . . . that the rights and obligations of parties under the code should be sorted out without traditional dependence on the concept of title, . . . strict reliance on the passing of title is nevertheless required when an applicable Code provisions refers to such title. GL. c. 106, § 2-401. One such situation is provided for in GL. c. 106, § 2-401 (3)(a), which states that, unless otherwise explicitly agreed by the parties, in transactions where delivery is to be made without moving the goods, if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents." (Citations omitted; internal quotation marks omitted.) Id., 363. The opinion is summarized through the court's holding that "[I]f light of [M.G.L.A. c. 90D, § 15], and independent of our reliance on the relevant Code provisions, [the transferor's] failure to comply with the requirement of § 15 as of [the date of the accident still] compels the conclusion that [the transferor] remained the owner of the vehicle at the time of the accident." Id., 354.
Massachusetts reached a similar decision concerning the transfer of ownership of a motor vehicle in Dickson v. Hertz Corp., 446 N.E.2d 100,15 Mass. App. 956 (1983). There, the court also explained that "ownership passes] to [a transferee] when he received] the documents of title. . . . Title passes when the documents of title are delivered." Id., 100. CT Page 15688
There is no basis for this court to conclude that the rules ofFireman's Fund Ins. Companies v. Blais, supra, and Dickson v. HertzCorp., supra, should not be applied to the facts of this case. Under the facts as found here, Sullivan was never vested with title to the plaintiff's motorcycle because the vehicle was never actually transferred to him, so that there was no compliance with the provisions of M.G.L.A. c. 90D, § 15(a) or M.G.L.A. c. 90D, § 15(e). Fireman's FundIns. Companies v. Blais, supra, 438 N.E.2d 354, 363. Even if Sullivan is found to have used or even to have had dominion and control over the vehicle at the relevant time, as is claimed by the defendants, there is no evidence from which the court could reasonably find that he legally owned the vehicle under the circumstances of this case. Id., 363. Neither the plaintiff nor Sullivan had ever recorded the motorcycle's title with the Massachusetts registry of motor vehicles. Accordingly, Sullivan's putative possession does not constitute ownership which vitiates the plaintiff's standing to pursue this conversion action. Dickson v. HertzCorp., supra, 446 N.E.2d 101.
Even if Connecticut law is applied, the court would be compelled to reach the same result.[31] The totality of the evidence, including the lack of a date upon the transfer portion of the title to the motorcycle, clearly supports the conclusion that neither the plaintiff nor Sullivan intended to effectuate immediate sale through the process of signing the document, and that Barron owned the vehicle at the times in question. Neither the plaintiff nor Sullivan had complied with the statutory provisions of General Statutes § 14-179, which is a legal prerequisite to the transfer of interest in the vehicle. Also, pursuant to Connecticut's application of the commercial code, absent formal delivery of the motorcycle, the transaction is not complete, and the owner retains title. General Statutes § 42-2-401 (2). In this state, title to goods, such as motor vehicles, passes upon delivery of the goods, despite nondelivery of a document of title. See General Statutes § 42-2-401 (2); DeRubbo v. Aetna Ins. Co., 161 Conn. 388, 393-94, 288 A.2d 430
(1971) (despite delivery of certificate of title to vehicle, the sale was effective upon delivery of the vehicle). "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time and place." (Internal quotation marks omitted.) DeRubbo v. Aetna Ins. Co.,161 Conn. 393-94. In this case, as the court has found that the plaintiff had not delivered the motorcycle to Sullivan for any purpose related to the sale of that vehicle, title had never passed to the potential purchaser. Accordingly, under Connecticut law, the plaintiff would have remained the owner of the vehicle at the time of its theft from Massachusetts.[32]
CT Page 15689
The plaintiff has submitted that the transfer of ownership of the motorcycle from him to Sullivan was also inchoate due to the absence of certain pertinent information on the title, specifically, the date of the sale transaction. Under Massachusetts law, the absence of this information upon the document of title would likely be found to be immaterial. Dickson v. Hertz Corp., supra, 446 N.E.2d 101. Accordingly, the court declines to accept this aspect of the plaintiff's argument.
As the plaintiff had retained legal ownership of the motorcycle at the time of its original theft, the plaintiff had standing to pursue his pending civil claim against the defendants. Accordingly, the defendants cannot prevail on their fourth special defense.
 V DETERMINATION OF DAMAGES
From the facts found in this matter, and according to the applicable principles of law, the court finds that the plaintiff h-as proved, by a preponderance of the evidence, the elements of the tort of conversion as against the defendants Benton, Fraczek, Green and Bell, and further finds that he is entitled to fair, just and reasonable damages as the result of their tortious conduct. As noted in Part III C, the court further finds that the plaintiff has also proved the elements of negligence against the Benton defendants, and that he is entitled to damages on this ground, as well. However, as the damages for negligence would, in large part, duplicate those for conversion, the court declines to assess damages for negligence against the Benton defendants.
 A DAMAGES FOR CONVERSION
It is generally acknowledged that the measure of damages in a conversion matter is the value of the goods at the time they were converted, with interest from the date of the wrongful act. Plikus v.Plikus, 26 Conn. App. 174, 178, 599 A.2d 392 (1991); Griffin v.Nationwide Moving Storage Co., 187 Conn. 405, 419-20, 446 A.2d 799
(1982); Kuzemka v. Gregory, 109 Conn. 117, 122, 146 A. 17 (1929);Schlesinger v. Prokopis, Superior Court, judicial district of New Haven at New Haven, Docket No. CV 930355034 (Dec. 6, 1996, Hodgson, J.). Our Supreme Court has held that in the absence of a contract which fixes the terms of recovery in the event of conversion or loss, the market value of the object at issue shall serve to establish the measure of damages, with the addition of applicable interest. Griffin v. Nationwide MovingCT Page 15690 Storage Co., supra, 187 Conn. 419.
While the evidence in this case does not disclose the appraised or statistical market value of the Suzuki Motorcycle at the time of its conversion, there is adequate, credible and reliable evidence which establishes the actual dollar amount the vehicle was worth to the plaintiff at that time. As discussed above, the plaintiff had made a number of improvements to the motorcycle after he purchased it in March of 1994. The vehicle had been used for a total of approximately 8,500 miles,[33] and Sullivan had agreed to purchase the vehicle, which was undamaged and in an enhanced condition as of August 19, 1994. The court fully credits the plaintiff's testimony, consistent with the title document submitted in evidence, establishing that Sullivan had agreed to pay the plaintiff $7,500 for the vehicle. As the result of the defendants' conversion of the motorcycle, however, the plaintiff was disabled from ever completing his contract for delivery to the vehicle's purchaser.
Under this analysis, the value of the motorcycle at the time of conversion was credibly established to be $7,500. Accordingly, this figure shall serve to fix the measure of damages for conversion, with the addition of applicable interest, as discussed below. Griffin v.Nationwide Moving Storage Co., supra, 187 Conn. 419.
 B COSTS AND INTEREST
In addition to applicable costs, the plaintiff claims that he is entitled to interest pursuant to General Statutes § 37-3a.[34]
"Prejudgment interest on money wrongfully withheld from the owner is a proper, albeit discretionary, element of a plaintiff's damages. Perl v.Case, 3 Conn. App. 111, 116, 485 A.2d 1331 (1985)." Suarez-Negrete v.Trotta, supra, 47 Conn. App. 522. "Section 37-3a allows the court, in its discretion, to award prejudgment interest for the wrongful retention of money." Paine Webber Jackson Curtis, Inc. v. Winters, 22 Conn. App. 640,652, 579 A.2d 545 (1990).
The application of § 37-3a depends on an analysis of the underlying circumstances of the case, or a determination of the facts. Paine WebberJackson Curtis, Inc. v. Winters, 22 Conn. App. 653. "Pursuant to General Statutes 37-3a, interest may be recovered in a civil action as damages for the detention of money after it becomes payable. We have construed the statute to make the allowance of interest depend upon "whether the detention of the money is or is not wrongful under the circumstances. Cecio Bros., Inc. v. Feldmann, 161 Conn. 265, 275, CT Page 15691287 A.2d 374 (1971). The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court. Bertozzi v. McCarthy, 164 Conn. 463,467, 323 A.2d 553 (1973)." (Footnote omitted; quotation marks omitted.)O'Hara v. State, 218 Conn. 628, 643, 590 A.2d 948 (1991). Courts may properly assess interest pursuant to § 37-3a in matters involving the conversion of goods, as well. See Griffin v. Nationwide Moving StorageCo., supra, 187 Conn. 419-20; Schlesinger v. Prokopis, Superior Court, judicial district of New Haven at New Haven, Docket No. CV 930355034 (Dec. 6, 1996, Hodgson, J.).
The circumstances of this case, where the Benton defendants failed to observe their duty to identify and locate the owner of the motorcycle, and where the evidence reflects a persistent pattern of DMV documents which contain false and misleading information, clearly support the award of statutory interest to the plaintiff; who suffered a loss as the result of the conversion at issue. Where interest is awarded pursuant to §37-3a, interest should be found to have accrued from the date of the defendants' conversion, through the date of the close of evidence at trial. See Suarez-Negrete v. Trotta, supra, 47 Conn. App. 518-519. In this matter, according to the factual findings set forth above, interest should properly be awarded to the plaintiff upon the conversion amount of $7,500 for the period extending from November 20, 1994 through August 18, 2000, according to the calculations established through § 37-3a.
 C DAMAGES FOR BENTON'S NEGLIGENCE
As noted in Part III, above, the plaintiff has successfully established that the Benton defendants deviated from the standard of care owed to him and that, as a result, he lost the use of his motorcycle from December 20, 1994 forward. The plaintiff has not delineated any distinction between the damages he suffered as a result of the Benton defendant's negligence and the damages he sustained as the result of the conversion of his motorcycle. The plaintiff produced no evidence from which the court could reasonably establish that, other than the loss of the use of the vehicle, he incurred any additional costs for transportation because he was unable to utilize the motorcycle, nor evidence from which the court could ascertain the degree of any emotional distress or mental anguish which flowed to him as the result of this incident.
The evidence discloses that the plaintiff sustained a property loss in the amount of $7,500, the value attributed to the vehicle at the time of its conversion. The court has previously its intention to award money damages of $7,500 to the plaintiff in response to the defendants' CT Page 15692 conversion. The plaintiff has not claimed that he is entitled to a double award in this action due to the Benton defendants' negligence and their concurrent conversion of his property, nor has he provided any legal authority which would support such an award. In this regard, the damages that have been awarded for the conversion of the motorcycle overlap those damages which may be awarded in response to the allegations of negligent acts or omissions by Benton and its employees. Accordingly, although the court has found the issue of negligence in favor of the plaintiff; he is entitled to recover only once the damages for the loss of the monetary value of his vehicle. Griffin v. Nationwide Moving Storage Co., supra.187 Conn. 419-20.
 D CLAIM FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES
The plaintiff has vigorously argued that the defendants' fraudulent misrepresentations in the preparation of motor vehicle documents and transfers of his motorcycle entitle him to an award of attorneys' fees and punitive damages in this case. Here, the plaintiff does not seek treble damages for the conversion of his motorcycle,[35] although he has raised the elements of the basis for a recovery in fraud in Part II. C. of his post-trial brief. Plaintiff's Trial Memorandum dated August 15, 2000. However, the plaintiff's complaint sets forth no specific allegations of fraudulent acts, misrepresentation, or intentional conduct on the part of the defendants. Notwithstanding the plausible applicability of this argument, in the absence of a specific allegation or language in the pleadings which would reasonably have alerted the defendants that damages in fraud were being asserted, the plaintiff is unable to recover attorney's fees or punitive relief.
The plaintiff's dilemma arises from the legal requirement that in determining whether such attorney's fees or punitive damages may be awarded to the plaintiff; the court is limited not only by the evidence presented at trial, but also by the allegations set forth in the complaint. "Generally, attorney's fees may not be recovered, either as costs or damages, absent contractual or statutory authorization. O'Learyv. Industrial Park Corp., 211 Conn. 648, 651, 560 A.2d 968 (1989); Plikusv. Plikus, [supra, 26 Conn. App. 179]. Attorney's fees may be awarded, however, as a component of punitive damages. O'Leary v. Industrial ParkCorp., supra, 651; Plikus v. Plikus, supra, 179. "To furnish a basis for recovery of such damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought.' Markey v.Santangelo, 195 Conn. 76, 77, 485 A.2d 1305 (1985). Punitive damages may CT Page 15693 be awarded upon a showing of fraud. O'Leary v. Industrial Park Corp.,
supra, 651; Plikus v. Plikus, supra, 180." Farrell v. Farrell,36 Conn. App. 305, 311, 650 A.2d 608 (1994).
A fair and objective review of the pleadings presented in this case, including the Demand for Relief; fails to disclose any language which is sufficiently explicit to have informed the defendants that the plaintiff was seeking fraud-related damages or attorney's fees. Neither the term "fraud" nor the term "misrepresentation" are found in any paragraph of the complaint, which is commendable for its lack of inflammatory or hyperbolic phrasing. The First, Second, Third and Seventh Counts set forth the plaintiff's claims in conversion without embellishment, and well within the anticipated scope of language permitted by the rules of fact pleading in this state.[36] However, the conversion allegations are barren of any express indication that the plaintiff intends to claim attorney's fees or punitive damages.
These counts do permit the reasonable inference that the Benton defendants' rightful possession of the motorcycle became conversion they exercised wrongful dominion over it, and these inferences have formed a part of the basis for the court's determination that, in fact, conversion occurred under the circumstances of this case. See Pamela B. v. Ment,244 Conn. 296, 308, 709 A.2d 1089 (1998) (for purposes of determining the legal adequacy of the pleadings, what is necessarily implied] need not be expressly alleged). The existence of such inferences do not, however, meet the "sufficiently explicit" test of informing the court and the defendants that such damages are at issue in the case. See Markey v.Santangelo, supra, 195 Conn. 77; Farrell v. Farrell, supra,36 Conn. App. 311. "Fraud is not a necessary part of a conversion . . . . The intent required for a conversion is merely an intent to exercise dominion or control over an item even if one reasonably relieves that the item is one's own. Luciani v. Stop Shop. Co., 15 Conn. App. 407,411-12, 544 A.2d 1239, cert. denied, 209 Conn. 809, 548 A.2d 437 (1988)."Plikus v. Plikus, supra, 26 Conn. App. 180. As the plaintiff did not plead fraud or misrepresentation in the text of the First, Second, Third and Seventh Counts, and as these counts do not permit the inference of fraud, the court here finds no basis for an award of attorney's fees or punitive damages in his favor.
As discussed in Part III, above, the Fourth, Fifth and Sixth Counts present the plaintiff's successful claims of negligence against the Benton defendants. However, these counts, as well, lack any specific language which could reasonably establish the foundation for the plaintiff's claim that he has effectively pleaded "wanton or wilful malicious misconduct" to support an award of attorney's fees or punitive damages, as contemplated by Farrell v. Farrell, supra, 36 Conn. App. 311. Rather than CT Page 15694 sufficiently and explicitly informing the court and defense counsel that such damages were being sought, the negligence counts allege that the Benton defendants had not acted in an intentionally misleading manner, but that they were careless and neglectful in their actions toward the plaintiff. Id.; see also Markey v. Santangelo, supra, 195 Conn. 77. Recognizing that the Fourth, Fifth and Sixth Counts present claims in addition to those set forth in the remainder of the complaint, the court nonetheless is constrained to find that the plaintiff has failed to meet his burden of pleading facts sufficient to place the defendants on notice that he seeks attorney's fees or punitive damages as the result of their deviation from the standard of care owed to him. by Farrell v. Farrell,
supra, 36 Conn. App. 311. Accordingly, the court here again finds no basis for an award of attorney's fees or punitive damages in favor of the plaintiff.
The court acknowledges that the Demand for Relief includes claims for both "Punitive Damages" and "Reasonable Attorney's Fees." Whether the Demand for Relief constitutes a part of the pleadings or not, the language of this document fails to provide adequate notice of any relationship between the facts set forth in the complaint and any claim the plaintiff may be relying upon for his claim of attorney's fees or punitive damages. The court finds that portion of the court file, as well, fails to satisfy the plaintiff's burden of placing the defendants on notice that he seeks enhanced damages pursuant to legal theories based upon fraud and misrepresentation. Accordingly, based on the legal principles and construction of the complaint noted above, the court finds that the plaintiff has failed to provide an adequate basis for an award of attorney's fees or punitive damages in this matter.
 V ORDERS
WHEREFORE, the court having found this matter in favor of the plaintiff Shawn Barron on the matter of conversion as to all parties, judgment is hereby rendered in his favor on the First, Second, Third and Seventh Counts of the complaint, and may enter for the plaintiff and against the defendants jointly and severally on those counts. The total amount of the judgment as to the plaintiff is $7,500; plus interest accrued from November 20, 1994, the date of conversion through August 18, 2000, the close of these proceedings, at the rate established by § 37-3a; plus court costs; all attributed to and payable by all defendants jointly and severally.
AND WHEREFORE, the court having found this matter in favor of the plaintiff Shawn Barron on the matter of negligence as to the defendants CT Page 15695 Benton Auto Body, Inc., Bozena Fraczek, and Leon Green, judgment is hereby rendered in his favor on the Fourth, Fifth and Sixth Counts of the complaint, and may enter against these defendants jointly and severally on those counts. However, the court having found that the plaintiff is entitled to damages in the amount of $7,500 as the result of the negligence of these defendants, but that he is not entitled to duplicate the damages previously awarded for conversion, the court awards no damages on the Fourth, Fifth and Sixth Counts, but allows the plaintiff such costs as maybe attributable to the prosecution of these counts.
BY THE COURT,
N. Rubinow, J.